*302 Justice Alito
delivered the opinion of the Court.
In this case, we decide whether the First Amendment allows a public-sector union to require objecting nonmembers to pay a special fee for the purpose of financing the union’s political and ideological activities.
I
A
Under California law, public-sector employees in a bargaining unit may decide by majority vote to create an “agency shop” arrangement under which all the employees are represented by a union selected by the majority. Cal. Govt. Code Ann. § 3502.5(a) (West 2010). While employees in the unit are not required to join the union, they must nevertheless pay the union an annual fee to cover the cost of union services related to collective bargaining (so-called chargeable expenses). See Lehnert v. Ferris Faculty Assn., 500 U. S. 507, 524 (1991); Machinists v. Street, 367 U. S. 740, 760 (1961).
Our prior cases have recognized that such arrangements represent an “impingement” on the First Amendment rights of nonmembers. Teachers v. Hudson, 475 U. S. 292, 307, n. 20 (1986). See also Davenport v. Washington Ed. Assn., 551 U. S. 177, 181 (2007) (“[A]gency-shop arrangements in the public sector raise First Amendment concerns because they force individuals to contribute money to unions as a condition of government employment”); Street, supra, at 749 (union shop presents First Amendment “questions of the utmost gravity”). Thus, in Abood v. Detroit Bd. of Ed., 431 U. S. 209 (1977), we held that a public-sector union, while permitted to bill nonmembers for chargeable expenses, may not require nonmembers to fund its political and ideological projects. And in Hudson, we identified procedural requirements that a union must meet in order to collect fees from nonmembers without violating their rights. 475 U. S., at 302-311. The First Amendment, we held, does not permit *303 a public-sector union to adopt procedures that have the effect of requiring objecting nonmembers to lend the union money to be used for political, ideological, and other purposes not germane to collective bargaining. Id., at 305. In the interest of administrative convenience, however, we concluded that a union “cannot be faulted” for calculating the fee that nonmembers must pay “on the basis of its expenses during the preceding year.” Id., at 307, n. 18.
Hudson concerned a union’s regular annual fees. The present case, by contrast, concerns the First Amendment requirements applicable to a special assessment or dues increase that is levied to meet expenses that were not disclosed when the amount of the regular assessment was set.
B
In June 2005, respondent, the Service Employees International Union, Local 1000 (SEIU), sent out its regular Hudson notice informing employees what the agency fee would be for the year ahead. The notice set monthly dues at 1% of an employee’s gross monthly salary but capped monthly dues at $45. Based on the most recently audited year, the SEIU estimated that 56.35% of its total expenditures in the coming year would be dedicated to chargeable collective-bargaining activities. Thus, if a nonunion employee objected within 30 days to payment of the full amount of union dues, the objecting employee was required to pay only 56.35% of total dues. The SEIU’s notice also included a feature that was not present in Hudson: The notice stated that the agency fee was subject to increase at any time without further notice.
During this time, the citizens of the State of California were engaged in ⅛ wide-ranging political debate regarding state budget deficits, and in particular the budget consequences of growing compensation for public employees backed by powerful public-sector unions. On June 13, 2005, Governor Arnold Schwarzenegger called for a special election to be held in November 2005, where voters would *304 consider various ballot propositions aimed at state-level structural reforms. Two of the most controversial issues on the ballot were Propositions 75 and 76. Proposition 75 would have required unions to obtain employees’ affirmative consent before charging them fees to be used for political purposes. Proposition 76 would have limited state spending and would have given the Governor the ability under some circumstances to reduce state appropriations for public-employee compensation. The SEIU joined a coalition of public-sector unions in vigorously opposing these measures. Calling itself the “Alliance for a Better California,” the group would eventually raise “more than $10 million, with almost all of it coming from public employee unions, including $2.75 million from state worker unions, $4.7 million from the California Teachers Association, and $700,000 from school workers unions.”[1]
On July 30, shortly after the end of the 30-day objection period for the June Hudson notice, the SEIU proposed a temporary 25% increase in employee fees, which it billed as an “Emergency Temporary Assessment to Build a Political Fight-Back Fund.” App. 25. The proposal stated that the money was needed to achieve the union’s political objectives, both in the special November 2005 election and in the November 2006 election. Id., at 26. According to the proposal, money in the Fight-Back Fund would be used “for a broad range of political expenses, including television and radio advertising, direct mail, voter registration, voter education, and get out the vote activities in our work sites and in our communities across California.” Ibid. The proposal specifically stated that “[tjhe Fund will not be used for regular costs of the union—such as office rent, staff salaries or routine equipment replacement, etc.” Ibid. It noted that “all other public worker unions are in the process of raising the extraordinary funds needed to defeat the Governor.” *305 Id., at 27. And it concluded: “Each of us must do our part to turn back these initiatives which would allow the Governor to destroy our wages and benefits and even our jobs, and threaten the well-being of all Californians.” Ibid. On August 27, the SEIU’s General Council voted to implement the proposal.
On August 31, the SEIU sent out a letter addressed to “Local 1000 Members and Fair Share Fee Payers,” announcing that, for a limited period, their fees would be raised to 1.25% of gross monthly salary and the $45-per-month cap on regular dues would not apply. Id., at 31. The letter explained that the union would use the fund to “defeat Proposition 76 and Proposition 75 on November 8,” and to “defeat another attack on [its] pension plan” in June 2006. Ibid. The letter also informed employees that, in the following year, the money would help “to elect a governor and a legislature who support public employees and the services [they] provide.” Ibid.
After receiving this letter, one of the plaintiffs in this case called the SEIU’s offices to complain that the union was levying the special assessment for political purposes without giving employees a fair opportunity to object. An SEIU area manager responded that “even if [the employee] objected to the payment of the full agency fee, there was nothing he could do about the September increase for the Assessment.” Knox v. Westly, No. 2:05-cv-02198, 2008 WL 850128, *3 (ED Cal., Mar. 28, 2008). “She also stated that ‘we are in the fight of our lives,’ that the Assessment was needed, and that there was nothing that could be done to stop the Union’s expenditure of that Assessment for political purposes.” Ibid. As a consolation, however, those employees who had filed timely objections after the regular June Hudson notice were required to pay only 56.35% of the temporary increase.
Petitioners filed this class-action suit on behalf of 28,000 nonunion employees who were forced to contribute money to the Political Fight-Back Fund. Some of the class members *306 had filed timely objections after receiving the regular Hudson notice in June, and others had not. Those who had objected argued that it was wrong to require them to pay 56.35% of the temporary assessment, which had been billed as intended for use in making political expenditures that they found objectionable. Those who had not objected after receiving the June Hudson notice contended that they should have received a new opportunity to object when the SEIU levied the special assessment for its Political FightBack Fund.
The District Court granted summary judgment for petitioners, finding that the union “fully intended to use the 12 million additional dollars it anticipated to raise for political purposes.” 2008 WL 850128, *7. “Even if every cent of the assessment was not intended to be used for entirely political purposes,” the court stated, “it is clear that the Union’s intent was to depart drastically from its typical spending regime and to focus on activities that were political or ideological in nature.” Id., at *8. In light of this fact, the court held that it would be inappropriate for the union to rely on previous annual expenditures to estimate that 56.35% of the new fee would go toward chargeable expenses. The court ordered the SEIU to send out a new notice giving all class members 45 days to object and to provide those who objected with a full refund of their contributions to the Political Fight-Back Fund. Id., at *12.
A divided panel of the Ninth Circuit reversed. Knox v. California State Employees Assn., Local 1000, 628 F. 3d 1115 (2010). According to the panel majority, Hudson prescribed the use of a balancing test. 628 F. 3d, at 1119-1120. The majority therefore inquired whether the procedure that the SEIU employed reasonably accommodated the interests of the union, the employer, and nonmembér employees. Id., at 1120-1123. Judge Wallace dissented,- arguing that the majority had misinterpreted Hudson and sanctioned the *307 abridgment of the First Amendment rights of nonmembers. 628 F. 3d, at 1123-1139.
We granted certiorari. 564 U. S. 1035 (2011).
HH HH
The SEIU argues that we should dismiss this case as moot. In opposing the petition for certiorari, the SEIU defended the decision below on the merits. After certiorari was granted, however, the union sent out a notice offering a full refund to all class members, and the union then promptly moved for dismissal of the case on the ground of mootness. Such postcertiorari maneuvers designed to insulate a decision from review by this Court must be viewed with a critical eye. See City News & Novelty, Inc. v. Waukesha, 531 U. S. 278, 283-284 (2001). The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed. See City of Mesquite v. Aladdin’s Castle, Inc., 455 U S. 283, 289 (1982). And here, since the union continues to defend the legality of the Political Fight-Back fee, it is not clear why the union would necessarily refrain from collecting similar fees in the future.
The union argues that concerns about voluntary cessation are inapplicable in this case because petitioners do not seek any prospective relief. See Motion To Dismiss as Moot 11-12. But even if that is so, the union’s mootness argument fails because there is still a live controversy as to the adequacy of the SEIU’s refund notice. A case becomes moot only when it is impossible for a court to grant “ ‘ “any effectual relief whatever” to the prevailing party.’” Erie v. Pap’s A. M., 529 U. S. 277, 287 (2000) (quoting Church of Scientology of Cal. v. United States, 506 U. S. 9, 12 (1992), in turn quoting Mills v. Green, 159 U. S. 651, 653 (1895)). “[A]s long as the parties have a concrete interest, however small, *308 in the outcome of the litigation, the case is not moot.” Ellis v. Railway Clerks, 466 U. S. 435, 442 (1984).
The District Court ordered the SEIU to send out a “proper” notice giving employees an adequate opportunity to receive a full refund. 2008 WL 850128, *12. Petitioners argue that the notice that the SEIU sent was improper because it includes a host of “conditions, caveats, and confusions as unnecessary complications aimed at reducing the number of class members who claim a refund.” Brief for Petitioners in Opposition to Motion To Dismiss 19. In particular, petitioners allege that the union has refused to accept refund requests by fax or e-mail and has made refunds conditional upon the provision of an original signature and a Social Security number. Id., at 18-19. As this dispute illustrates, the nature of the notice may affect how many employees who object to the union’s special assessment will be able to get their money back. The union is not entitled to dictate unilaterally the manner in which it advertises the availability of the refund.
For this reason, we conclude that a live controversy remains, and we proceed to the merits.
1—< H-i )—l
A
Our cases have often noted the close connection between our Nation’s commitment to self-government and the rights protected by the First Amendment. See, e. g., Brown v. Hartlage, 456 U. S. 45, 52 (1982) (“At the core of the First Amendment are certain basic conceptions about the manner in which political discussion in a representative democracy should proceed”); Buckley v. Valeo, 424 U. S. 1, 93, n. 127 (1976) (per curiam) (“[T]he central purpose of the Speech and Press Clauses was to assure a society in which ‘uninhibited, robust, and wide-open’ public debate concerning matters of public interest would thrive, for only in such a society can a healthy representative democracy flourish”); Cox v. *309 Louisiana, 379 U. S. 536, 552 (1965) (“Maintenance of the opportunity for free political discussion is a basic tenet of our constitutional democracy”); Whitney v. California, 274 U. S. 357, 375 (1927) (Brandeis, J., concurring); Patterson v. Colorado ex rel. Attorney General of Colo., 205 U. S. 454, 465 (1907) (Harlan, J., dissenting).
The First Amendment creates “an open marketplace” in which differing ideas about political, economic, and social issues can compete freely for public acceptance without improper government interference. New York State Bd. of Elections v. Lopez Torres, 552 U. S. 196, 208 (2008). See also Hustler Magazine, Inc. v. Falwell, 485 U. S. 46, 51 (1988); Mills v. Alabama, 384 U. S. 214, 218-219 (1966). The government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves. See R. A. V. v. St. Paul, 505 U. S. 377, 382 (1992); Brandenburg v. Ohio, 395 U. S. 444, 447-448 (1969) (per curiam); West Virginia Bd. of Ed. v. Barnette, 319 U. S. 624 (1943); Wooley v. Maynard, 430 U. S. 705, 713-715 (1977); Riley v. National Federation of Blind of N. C., Inc., 487 U. S. 781, 797 (1988) (The First Amendment protects “the decision of both what to say and what not to say” (emphasis deleted)). And the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed. See Roberts v. United States Jaycees, 468 U. S. 609, 623 (1984) (“Freedom of association . . . plainly presupposes a freedom not to associate”); NAACP v. Alabama ex rel. Patterson, 357 U. S. 449, 460-461 (1958).
Closely related to compelled speech and compelled association is compelled funding of the speech of other private speakers or groups. See Abood, 431 U. S., at 222-223. In United States v. United Foods, Inc., 533 U. S. 405 (2001), we considered the constitutionality of a state scheme that compelled such funding. The subject of the speech at issue— promoting the sale of mushrooms—was not one that is likely to stir the passions of many, but the mundane commercial *310 nature of that speech only highlights the importance of our analysis and our holding.
The federal Mushroom Promotion, Research, and Consumer Information Act required that fresh mushroom handlers pay assessments used primarily to fund advertisements promoting mushroom sales. A large producer objected to subsidizing these generic ads, and even though we applied the less demanding standard used in prior cases to judge laws affecting commercial speech, we held that the challenged scheme violated the First Amendment. We made it clear that compulsory subsidies for private speech are subject to exacting First Amendment scrutiny and cannot be sustained unless two criteria are met. First, there must be a comprehensive regulatory scheme involving a “mandated association” among those who are required to pay the subsidy. Id., at 414. Such situations are exceedingly rare because, as we have stated elsewhere, mandatory associations are permissible only when they serve a “compelling state interes[t] . . . that cannot be achieved through means significantly less restrictive of associational freedoms.” Roberts, supra, at 623. Second, even in the rare case where a mandatory association can be justified, compulsory fees can be levied only insofar as they are a “necessary incident” of the “larger regulatory purpose which justified the required association.” United Foods, supra, at 414.
B
When a State establishes an “agency shop” that exacts compulsory union fees as a condition of public employment, “[t]he dissenting employee is forced to support financially an organization with whose principles and demands he may disagree.” Ellis, supra, at 455. Because a public-sector union takes many positions during collective bargaining that have powerful political and civic consequences, see Tr. of Oral Arg. 48-49, the compulsory fees constitute a form of compelled speech and association that imposes a “significant *311 impingement on First Amendment rights.” Ellis, 466 U. S., at 455. Our cases to date have tolerated this “impingement,” and we do not revisit today whether the Court’s former cases have given adequate recognition to the critical First Amendment rights at stake.
“The primary purpose” of permitting unions to collect fees from nonmembers, we have said, is “to prevent nonmembers from free-riding on the union’s efforts, sharing the employment benefits obtained by the union’s collective bargaining without sharing the costs incurred.” Davenport, 551 U. S., at 181. Such free-rider arguments, however, are generally insufficient to overcome First Amendment objections. Consider the following examples:
“If a community association engages in a clean-up campaign or opposes encroachments by industrial development, no one suggests that all residents or property owners who benefit be required to contribute. If a parent-teacher association raises money for the school library, assessments are not levied on all parents. If an association of university professors has as a major function bringing pressure on universities to observe standards of tenure and academic freedom, most professors would consider it an outrage to be required to join. If a medical association lobbies against regulation of fees, not all doctors who share in the benefits share in the costs.”[2]
Acceptance of the free-rider argument as a justification for compelling nonmembers to pay a portion of union dues represents something of an anomaly—one that we have found to be justified by the interest in furthering “labor peace.” Hudson, 475 U. S., at 303. But it is an anomaly nevertheless.
*312 Similarly, requiring objecting nonmembers to opt out of paying the nonchargeable portion of union dues—as opposed to exempting them from making such payments unless they opt in—represents a remarkable boon for unions. Courts “do not presume acquiescence in the loss of fundamental rights.” College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd., 527 U. S. 666, 682 (1999) (internal quotation marks omitted). Once it is recognized, as our cases have, that a nonmember cannot be forced to fund a union’s political or ideological activities, what is the justification for putting the burden on the nonmember to opt out of making such a payment? Shouldn’t the default rule comport with the probable preferences of most nonmembers? And isn’t it likely that most employees who choose not to join the union that represents their bargaining unit prefer not to pay the full amount of union dues? An opt-out system creates a risk that the fees paid by nonmembers will be used to further political and ideological ends with which they do not agree. But a “[ujnion should not be permitted to exact a service fee from nonmembers without first establishing a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining.” Hudson, supra, at 305 (internal quotation marks omitted).
Although the difference between opt-out and opt-in schemes is important, our prior cases have given surprisingly little attention to this distinction. Indeed, acceptance of the opt-out approach appears to have come about more as a historical accident than through the careful application of First Amendment principles.
The trail begins with dicta in Street, where we considered whether a federal collective-bargaining statute authorized a union to impose compulsory fees for political activities. 367 U. S., at 774. The plaintiffs were employees who had affirmatively objected to the way their fees were being used, and so we took that feature of the case for granted. We held *313 that the statute did not authorize the use of the objecting employees’ fees for ideological purposes, and we stated in passing that “dissent is not to be presumed—it must affirmatively be made known to the union by the dissenting employee.” Ibid. In making that offhand remark, we did not pause to consider the broader constitutional implications of an affirmative opt-out requirement. Nor did we explore the extent of First Amendment protection for employees who might not qualify as active “dissenters” but who would nonetheless prefer to keep their own money rather than subsidizing by default the political agenda of a state-favored union.
In later cases such as Abood and Hudson, we assumed without any focused analysis that the dicta from Street had authorized the opt-out requirement as a constitutional matter. Thus in Hudson we did not take issue with the union’s practice of giving employees annual notice and an opportunity to object to expected political expenditures. At the same time, however, we made it clear that the procedures used by a union to collect money from nonmembers must satisfy a high standard.
Contrary to the view of the Ninth Circuit panel majority, we did not call for a balancing of the “right” of the union to collect an agency fee against the First Amendment rights of nonmembers. 628 F. 3d, at 1119-1120. As we noted in Davenport, “unions have no constitutional entitlement to the fees of nonmember-employees.” 551 U. S., at 185. A union’s “collection of fees from nonmembers is authorized by an act of legislative grace,” 628 F. 3d, at 1126 (Wallace, J., dissenting)—one that we have termed “unusual” and “extraordinary,” Davenport, supra, at 184, 187. Far from calling for a balancing of rights or interests, Hudson made it clear that any procedure for exacting fees from unwilling contributors must be “carefully tailored to minimize the infringement” of free speech rights. 475 U. S., at 303. And to underscore the meaning of this careful tailoring, we followed that statement with a citation to cases holding that measures bur *314 dening the freedom of speech or association must serve a “compelling interest” and must not be significantly broader than necessary to serve that interest.[3]
IV
By authorizing a union to collect fees from nonmembers and permitting the use of an opt-out system for the collection of fees levied to cover nonchargeable expenses, our prior decisions approach, if they do not cross, the limit of what the First Amendment can tolerate. The SEIU, however, asks us to go farther. It asks us to approve a procedure under which (1) a special assessment billed for use in electoral campaigns was assessed without providing a new opportunity for nonmembers to decide whether they wished to contribute to this effort and (2) nonmembers who previously opted out were nevertheless required to pay more than half of the special assessment even though the union had said that the purpose of the fund was to mount a political campaign and that it would not be used for ordinary union expenses. This aggressive use of power by the SEIU to collect fees from nonmembers is indefensible.
A
First, we see no justification for the union’s failure to provide a fresh Hudson notice. Hudson rests on the principle that nonmembers should not be required to fund a union’s *315 political and ideological projects unless they choose to do so after having “a fair opportunity” to assess the impact of paying for nonchargeable union activities. 475 U. S., at 303. Giving employees only one opportunity per year to make this choice is tolerable if employees are able at the time in question to make an informed choice. But a nonmember cannot make an informed choice about a special assessment or dues increase that is unknown when the annual notice is sent. When a union levies a special assessment or raises dues as a result of unexpected developments, the factors influencing a nonmember’s choice may change. In particular, a nonmember may take special exception to the uses for which the additional funds are sought.[4]
The present case provides a striking example. The special assessment in this case was billed for use in a broad electoral campaign designed to defeat two important and controversial ballot initiatives and to elect sympathetic candidates in the 2006 gubernatorial and legislative elections. There were undoubtedly nonmembers who, for one reason or another, chose not to opt out or neglected to do so when the standard Hudson notice was sent but who took strong exception to the SEIU’s political objectives and did not want to subsidize those efforts. These nonmembers might have favored one or both of the ballot initiatives; they might have wished to support the reelection of the incumbent Governor; or they might not have wanted to delegate to the union the authority to decide which candidates in the 2006 elections would receive a share of their money.
The effect on nonmembers was particularly striking with respect to the union’s campaign against Proposition 75 be *316 cause that initiative would have bolstered nonmember rights. If Proposition 75 had passed, nonmembers would have been exempt from paying for the SEIU’s extensive political projects unless they affirmatively consented. Thus, the effect of the SEIU’s procedure was to force many nonmembers to subsidize a political effort designed to restrict their own rights.
As Hudson held, procedures for collecting fees from nonmembers must be carefully tailored to minimize impingement on First Amendment rights, and the procedure used in this case cannot possibly be considered to have met that standard. After the dues increase was adopted, the SEIU wrote to all employees in the relevant bargaining units to inform them of this development. It would have been a relatively simple matter for the union to cast this letter in the form of a new Hudson notice, so that nonmembers could decide whether they wanted to pay for the union’s electoral project.
The SEIU argues that we should not be troubled by its failure to provide a new notice because nonmembers who objected to the special assessment but were nonetheless required to pay it would have been given the chance to recover the funds in question by opting out when the next annual notice was sent. If the special assessment was used entirely or in part for nonchargeable purposes, they suggest, the percentage of the union’s annual expenditures for chargeable purposes would decrease, and therefore the amount of the dues payable by objecting nonmembers the following year would also decrease. This decrease, however, would not fully recompense nonmembers who did not opt out after receiving the regular notice but would have opted out if they had been permitted to do so when the special assessment was announced.[5] And in any event, evenga full refund would *317 not undo the violation of First Amendment rights. As we have recognized, the First Amendment does not permit a union to extract a loan from unwilling nonmembers even if the money is later paid back in full. See Hudson, 475 U. S., at 305; Ellis, 466 U. S., at 444. Here, for nonmembers who disagreed with the SEIU’s electoral objectives, a refund provided after the union’s objectives had already been achieved would be cold comfort.[6]
To respect the limits of the First Amendment, the union should have sent out a new notice allowing nonmembers to opt in to the special fee rather than requiring them to opt out. Our cases have tolerated a substantial impingement on First Amendment rights by allowing unions to impose an opt-out requirement at all. Even if this burden can be justified during the collection of regular dues on an annual basis, there is no way to justify the additional burden of imposing yet another opt-out requirement to collect special fees whenever the union desires.
CD
rH
The SEIU’s treatment of nonmembers who opted out when the initial Hudson notice was sent also ran afoul of the First Amendment. The SEIU required these employees to pay *318 56.35% of the special assessment, just as they had been required to pay 56.35% of the regular annual dues. But the union proclaimed that the special assessment would be used to support an electoral campaign and would not be used for ordinary union expenses. Accordingly, there is no reason to suppose that 56.35% of the new assessment was used for properly chargeable expenses. On the contrary, if the union is to be taken at its word, virtually all of the money was slated for nonchargeable uses.
The procedure accepted in Hudson is designed for use when a union sends out its regular annual dues notices. The procedure is predicated on the assumption that a union’s allocation of funds for chargeable and nonchargeable purposes is not likely to vary greatly from one year to the next.[7] No such assumption is reasonable, however, when a union levies a special assessment or raises dues as a result of events that were not anticipated or disclosed at the time when a yearly Hudson notice was sent. Accordingly, use of figures based on an audit of the union’s operations during an entire previous year makes no sense.
Nor would it be feasible to devise a new breakdown of chargeable and nonchargeable expenses for the special assessment. Determining that breakdown is problematic enough when it is done on a regular annual basis because auditors typically do not make a legal determination as to whether particular expenditures are chargeable. Instead, the auditors take the union’s characterization for granted and perform the simple accounting function of “ensuring] that the expenditures which the union claims it made for *319 certain expenses were actually made for those expenses.” Andrews v. Education Assn. of Cheshire, 829 F. 2d 335, 340 (CA2 1987). Thus, if a union takes a very broad view of what is chargeable—if, for example, it believes that supporting sympathetic political candidates is chargeable and bases its classification on that view—the auditors will classify these political expenditures as chargeable. Objecting employees may then contest the union’s changeability determinations, but the onus is on the employees to come up with the resources to mount the legal challenge in a timely fashion.[8] See, e. g., Lehnert, 500 U. S., at 513; Jibson v. Michigan Ed. Assn., 30 F. 3d 723, 730 (CA6 1994). This is already a significant burden for employees to bear simply to avoid having their money taken to subsidize speech with which they disagree, and the burden would become insupportable if unions could impose a new assessment at any time, with a new changeability determination to be challenged.
2
The SEIU argues that objecting nonmembers who were required to pay 56.35% of the special assessment, far from subsidizing the union’s political campaign, actually received a windfall. According to the union’s statistics, the actual percentage of regular dues and fees spent for chargeable purposes in 2005 turned out to be quite a bit higher (66.26%), and therefore, even if all of the money obtained through the special assessment is classified as nonchargeable, the union’s total expenditures for 2005 were at least 66.26% chargeable. See Brief for Respondent 5, n. 6. This argument is unpersuasive for several reasons.
First, the SEIU’s understanding of the breadth of chargeable expenses is so expansive that it is hard to place much *320 reliance on its statistics. In its brief, the SEIU argues broadly that all funds spent on “lobbying ... the electorate” are chargeable. See id., at 51. But “lobbying . . . the electorate” is nothing but another term for supporting political causes and candidates, and we have never held that the First Amendment permits a union to compel nonmembers to support such political activities. On the contrary, as long ago as Street, we noted the important difference between a union’s authority to engage in collective bargaining and related activities on behalf of nonmember employees in a bargaining unit and the union’s use of nonmembers’ money “to support candidates for public office” or “to support political causes which [they] oppos[e].” 367 U. S., at 768.
The sweep of the SEIU’s argument is highlighted by its discussion of the use of fees paid by objecting nonmembers to defeat Proposition 76. According to the SEIU, these expenditures were “germane” to the implementation of its contracts because, if Proposition 76 had passed, it would have “effectively permitted the Governor to abrogate the Union’s collective bargaining agreements under certain circumstances, undermining the Union’s ability to perform its representation duty of negotiating effective collective bargaining agreements.” Brief for Respondent 49-50 (internal quotation marks omitted).
If we were to accept this broad definition of germaneness, it would effectively eviscerate the limitation on the use of compulsory fees to support unions’ controversial political activities. Public-employee salaries, pensions, and other benefits constitute a substantial percentage of the budgets of many States and their subdivisions. As a result, a broad array of ballot questions and campaigns for public office may be said to have an effect on present and future contracts between public-sector workers and their employers. If the concept of “germaneness” were as broad as the SEIU advocates, public-sector employees who do not endorse the unions’ goals would be essentially unprotected against being *321 compelled to subsidize political and ideological activities to which they object.
Second, even if the SEIU’s statistics are accurate, it does not follow that it was proper for the union to charge objecting nonmembers 56.35%—or any other particular percentage—of the special assessment. Unless it is possible to determine in advance with some degree of accuracy the percentage of union funds that will be used during an upcoming year for chargeable purposes—and the SEIU argues that this is not possible—there is at least a risk that, at the end of the year, unconsenting nonmembers will have paid either too much or too little. Which side should bear this risk?
The answer is obvious: the side whose constitutional rights are not at stake. “Given the existence of acceptable alternatives, [a] union cannot be allowed to commit dissenters’ funds to improper uses even temporarily.” Ellis, 466 U. S., at 444. Thus, if unconsenting nonmembers pay too much, their First Amendment rights are infringed. On the other hand, if un-consenting nonmembers pay less than their proportionate share, no constitutional right of the union is violated because the union has no constitutional right to receive any payment from these employees. See Davenport, 551 U. S., at 185. The union has simply lost for a few months the “extraordinary” benefit of being empowered to compel nonmembers to pay for services that they may not want and in any event have not agreed to fund.
As we have noted, by allowing unions to collect any fees from nonmembers and by permitting unions to use opt-out rather than opt-in schemes when annual dues are billed, our cases have substantially impinged upon the First Amendment rights of nonmembers. In the new situation presented here, we see no justification for any further impingement. The general rule—individuals should not be compelled to subsidize private groups or private speech—should prevail.
Public-sector unions have the right under the First Amendment to express their views on political and social is *322 sues without government interference. See, e. g., Citizens United v. Federal Election Comm’n, 558 U. S. 310 (2010). But employees who choose not to join a union have the same rights. The First Amendment creates a forum in which all may seek, without hindrance or aid from the State, to move public opinion and achieve their political goals. “First Amendment values [would be] at serious risk if the government [could] compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that [the government] favors.” United Foods, 533 U. S., at 411. Therefore, when a public-sector union imposes a special assessment or dues increase, the union must provide a fresh Hudson notice and may not exact any funds from nonmembers without their affirmative consent.[9]
*323 [[Image here]]
The judgment of the Ninth Circuit is reversed, and the ease is remanded for further proceedings consistent with this opinion.

It is so ordered.

 Marinucci & Wildermuth, Schwarzenegger Adds Prop. 75 to His Agenda, San Francisco Chronicle, Sept. 18, 2005, p. A-17.

 Summers, Book Review, Sheldon Leader, Freedom of Association: A Study in Labor Law and Political Theory, 16 Comparative Labor L. J. 262, 268 (1995).

 The specific citation was as follows:
“See Roberts v. United States Jaycees, [468 U. S. 609, 623 (1984)] (Infringements on freedom of association ‘may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms’); Elrod v. Burns, 427 U. S. 347, 363 (1976) (government means must be ‘least restrictive of freedom of belief and association’); Kusper v. Pontikes, 414 U. S. 51, 58-59 (1973) (‘[E]ven when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty’); NAACP v. Button, 371 U. S. 415, 438 (1963) (‘Precision of regulation must be the touchstone’ in the First Amendment context).” Hudson, 475 U. S., at 303, n. 11.

 The dissent suggests that the union gave fair notice because it announced at the beginning of the year that “‘[d]ues are subject to change without further notice to fee payers.’” Post, at 339 (opinion of Breyer, J.). But a union cannot define the scope of its own notice obligations simply by promulgating a clause giving itself the power to increase fees at any time for any purpose without further notice.

 These nonmembers, after paying the full amoupt of the special assessment, would be required during the subsequent year to pay at least as much as those nonmembers who did opt out when they received the initial Hudson notice.

 Justice Sotomayor contends that a new Hudson notice should he required only when a special assessment is imposed for political purposes. Post, at 324 (opinion concurring in judgment). But as even the dissent acknowledges, post, at 334-335, such a rule would be unworkable. First, our cases have recognized that a union’s money is fungible, so even if the new fee were spent entirely for nonpolitical activities, it would free up other funds td be spent for political purposes. See Retail Clerks v. Schermerhorn, 373 U. S. 746, 753 (1963) (noting that particular fee earmarks are “of bookkeeping significance only rather than a matter of real substance”). And second, unless we can rely on unions to advertise the true purpose behind every special fee, it is not clear how a court could make a timely determination whether each new fee is political in nature. It would be practically impossible to require the parties to litigate the purpose of every fee merely to determine whether notice is required.

 The SEIU contends that “[significant fluctuations in the chargeable and nonchargeable proportions of a union’s spending are inevitable,” Brief for Respondent 13, and the dissent appears to agree, post, at 337. But if the Hudson Court had proceeded on this assumption it is doubtful that it would have found it acceptable for a union to rely 'polely on the breakdown in the most recent year rather than computing ;the average breakdown over a longer period. ,

 The dissent is comforted by the fact that the union “has offered to pay for neutral arbitration of such disputes before the American Arbitration Association,” post, at 337, but the painful burden of initiating and participating in such disputes cannot be so easily relieved.

 Contrary to Justice Sotomayoe’s suggestion, our holding does not venture beyond the scope of the questions on which we granted review or the scope of the parties’ dispute. The second question on which we granted review broadly asks us to determine the circumstances under which a State may deduct from the pay of nonunion employees money that is used by a union for general electioneering. See Pet. for Cert, (i) (“May a State, consistent with the First and Fourteenth Amendments, condition continued public employment on the payment of union agency fees for purposes of financing political expenditures for ballot measures?”). Our holding—that this may be done only when the employee affirmatively consents—falls within that question.
Our holding also addresses the primary remaining dispute between the parties, namely, the particular procedures that must be followed on remand in order to provide adequate assurance that members of the class are not compelled to subsidize nonehargeable activities to which they object. See supra, at 307-308. Petitioners argue strenuously that these procedures must be narrowly tailored to minimize intrusion on their free speech rights. See Brief for Petitioners 11-17. We see no sensible way to address this dispute without confronting the question whether, in the particular context present here, an opt-out regime suffices.
Justice Sotomayor would apparently have us proceed on the assumption that an opt-out regime is permitted. She would then have us decide what sort of opt-out procedures would be sufficient if such a regime were allowed at all. But that is a question that simply cannot be answered. It would be like asking what sort of procedural requirements would be *323 required if the government set out to do something else that the First Amendment flatly prohibits—for example, requiring prepublication approval of newspapers.
There is also no merit in Justice Sotomayor’s and Justice Breyer’s comments about prior precedent. This ease concerns the procedures that must be followed when a public-sector union announces a special assessment or midyear dues increase. No prior decision of this Court has addressed that question, and Hvdson says not one word on the subject.