In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 16-3487

THERESA RIFFEY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

BRUCE V. RAUNER, in his official capacity as Governor of the State of Illinois, and SEIU HEALTHCARE ILLINOIS & INDIANA,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 02477 — **Manish S. Shah**, *Judge*.

_____

ARGUED MAY 17, 2017 — DECIDED OCTOBER 11, 2017

_____

Before WOOD, *Chief Judge*, and MANION and HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. Class and collective actions are designed to provide an efficient vehicle to resolve the claims of a large number of plaintiffs in one fell swoop. They can offer benefits to both sides in a case: plaintiffs are able to aggregate resources in order to litigate small claims, and defendants can achieve a global resolution of the dispute. But class actions are

not always the best vehicle for delivering relief. This is why Federal Rule of Civil Procedure 23 establishes a number of criteria that parties (usually plaintiffs) must meet in order to maintain a class action, and why district courts have considerable discretion in determining whether and how to manage such actions.

The appellants in this case are home health care assistants who wanted the district court to certify a class of their fellow assistants for purposes of securing a class-wide refund of the fair-share fees they paid to a union for collective bargaining representation. For a number of reasons, the district court found that the class should not be certified. It awarded injunctive relief in favor of the plaintiffs, as well as individual damages, and this appeal followed. Because we find no abuse of discretion in the court's refusal to certify the class, we affirm.

## I

The State of Illinois, through its Department of Human Services Home Services Program, pays personal home health care assistants to deliver care to elderly and disabled persons in the state. Under Illinois law, the assistants are considered public employees for purposes of collective bargaining. See Illinois Public Labor Relations Act (IPLRA), 20 ILCS 2405/3(f). The same law authorizes the state to engage in collective bargaining with an exclusive representative of home care and health workers. See *id.* Since 2003, SEIU Healthcare Illinois & Indiana (the "Union") has been the exclusive representative. The exclusive representative is required to represent all public employees, whether or not they are members of the Union. Under the terms of its collective bargaining agreement with the state, the Union was entitled to collect limited fees from workers who chose not to join the Union in order to help cover

the cost of certain activities, principally the collective bargaining representation it furnished to everyone. These fees were known as "fair-share fees," and until recently they were automatically deducted from the pay of assistants who were not Union members.

Some workers objected to this fair-share arrangement. In April 2010, they filed this suit, in which they contend that the involuntary deduction and collection of the fair-share fees violates their First Amendment rights and entitles them to relief pursuant to 42 U.S.C. § 1983. For convenience, we refer to them as the Objectors. The district court dismissed their claim and we affirmed, see *Harris v. Quinn*, 656 F.3d 692 (7th Cir. 2011) (detailing the plaintiffs' First Amendment claims). But the Supreme Court agreed with the Objectors and reversed in *Harris v. Quinn*, 134 S. Ct. 2618 (2014). In accordance with the Court's decision in *Harris*, we remanded the case to the district court for further proceedings.

Once back in the district court, the Objectors amended their complaint to substitute new named plaintiffs for their proposed class and to reflect the fact that the Governor of Illinois is now Bruce V. Rauner. They then sought certification of a class of all non-union member assistants from whom fair-share fees were collected from April 2008 until June 30, 2014 (the date of the Supreme Court's *Harris* decision), when the state stopped the fair-share deductions. The Objectors contend that their proposed class, which numbers around 80,000 members, is entitled to a refund of the total of the fair-share fees paid by its members—approximately $32 million.

The Union opposed the motion for class certification; the Governor took no position on the class issue and is not partic-

ipating in this appeal. The district court decided that class cer-
tification was inappropriate for several reasons: the class def-
inition was overly broad in light of evidence (detailed by the
court) that a substantial number of class members did not ob-
ject to the fee and could not have suffered an injury; the
named plaintiffs were not adequate representatives; individ-
ual questions regarding damages predominated over com-
mon ones; the class faced serious manageability issues; and a
class action was not a superior method of resolving the issue.
The parties then stipulated to a judgment permanently enjoin-
ing the future collection of fair-share fees and awarding
money damages to the named plaintiffs. The district court en-
tered final judgment, and this appeal followed.

## II

The Objectors have placed most of their reliance on appeal
on the argument that the district court's refusal to certify
rested on an error of law: specifically, the proposition that de-
ducting the fair-share fees could have caused a First Amend-
ment injury to a worker only if she subjectively opposed the
Union or the fee at the time it was paid. We review the district
court's denial of class certification for abuse of discretion.
*Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 922 (7th Cir.
2016). "A district court abuses its discretion when it commits
an error of law or makes a clearly erroneous finding of fact."
*Kress v. CCA of Tenn., LLC*, 694 F.3d 890, 892 (7th Cir. 2012).

In order to have a case in a federal court, a plaintiff must
plead that she has been injured in a concrete and particular-
ized way by a defendant's actions. *Lujan v. Defenders of Wild-
life*, 504 U.S. 555, 560 (1992). And in order to state a claim un-
der 42 U.S.C. § 1983, that injury must include a violation of
the plaintiff's constitutional or statutory rights. The named

plaintiffs here alleged that collecting fair-share fees without consent ran afoul of the First Amendment, and the Supreme Court agreed with them. The named plaintiffs then settled with the Union; the nature of their injuries is thus not before us.

The proposed class, however, presents interesting aspects of the nature of injury in First Amendment compelled subsidization cases. Whereas we understand that the named plaintiffs objected to the collection of the fair-share fees and to collective bargaining representation, we have no way of knowing whether or how many of the remaining class members shared that opposition. Nothing in *Harris* said that people could not *voluntarily* join a union, or *voluntarily* pay a fair-share fee. Its focus was exclusively on compelled participation. See, *e.g.*, 134 S. Ct. at 2644 ("The First Amendment prohibits the collection of an agency fee from personal assistants in the Rehabilitation Program *who do not want to join or support the union*.") (emphasis added). The district court highlighted the Union's evidence that many of the would-be class members had submitted affidavits contending that they did not object to the fair-share fees and would have consented if given the chance (a step that was unnecessary during the pre-*Harris* regime, when fair-share fees were automatically collected). It concluded that there were likely a significant number of workers in the proposed class whose First Amendment rights had not been injured by the fee collection.

The Objectors urge that the question whether any given worker in the proposed class was subjectively opposed to paying the fees is extraneous to whether or not their First Amendment rights were violated. They characterize the injury as the denial of the choice to pay or not pay. In their view,

it is enough that the money was taken without their affirmative consent and used for purposes of collective bargaining representation.

But we cannot accept that characterization in the face of direct evidence from the supposedly injured class members that they did not feel injured at all, and that they would have happily paid the fair-share fee without complaint. The premise of the Objectors' argument—that these funds were taken without consent—stands on shaky ground. They presume that silence was equivalent to non-consent, while the Union argues that silence against the backdrop of the earlier legal regime in which there was no obligation to signify consent is at worst uninformative, and if anything suggests consent.

We can assume that the taking of money without consent or legal justification is enough to give rise to some kind of a tort, but it is less clear that such a taking implicates the First Amendment. Compelled subsidization can violate the First Amendment because it impinges on First Amendment rights. See *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 321 (2012) ("[B]y allowing unions to collect any fees from nonmembers … our cases have substantially impinged upon the First Amendment rights of nonmembers. … [W]e see no justification for any further impingement. The general rule—individuals should not be compelled to subsidize private groups or private speech—should prevail."). Nonetheless, a course of conduct or a rule that impinges upon the exercise of a legal right does not always injure the people it affects, certainly not if they consent or voluntarily accept the rule. In the compelled speech context, for instance, although a requirement to recite the Pledge of Allegiance every morning might impermissibly impinge upon all students' rights to

choose whether to do so, see *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), it seems fair to say that many of them would happily have recited the Pledge anyway and thus suffered no First Amendment injury from the rule. Or, to take another example, most Granite Staters evidently had no objection to the motto "Live Free or Die" on their license plates, and so would not have had standing to object to it, even though George Maynard found it repugnant to his beliefs. See *Wooley v. Maynard*, 430 U.S. 705 (1977).

The Objectors urge that even if some measure of subjective opposition is required to show a First Amendment injury, the choice not to join the Union ought to be sufficient to demonstrate that opposition and hence to show a First Amendment injury. But a choice not to join the Union is not the relevant one for our purposes. This case has always been about the decision whether to support collective bargaining representation and pay the fair-share fee, and the personal assistants were never asked to express a preference on that point. At most, we know that the proposed class members did not become full union members during the period when the fees were collected. We have no way of knowing which of three choices they might have made, had *Harris* been on the books during the entire time: join the Union; voluntarily pay fair-share fees; or pay nothing. The Objectors scoff at the idea that anything but "pay nothing" would be selected, but the district court had before it evidence that the majority of personal assistants in 2003 voted for union representation, that a majority ratified the collective bargaining agreement in 2008 and 2012, and that 65% of the proposed class members who are still personal assistants have since joined the union. It was a reasonable inference from those facts that a significant number of

class members would indeed have chosen the first or second option, had they realized the need to do so.

The question whether it is permissible to take subjective factors into account in a First Amendment case has interesting implications in the class action context. In order to be ascertainable, a class must be defined based on objective criteria. Classes "defined by subjective criteria, such as by a person's state of mind, fail the objectivity requirement." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659–60 (7th Cir. 2015) (citations omitted). The result may be that class treatment is more difficult to secure in such a personal area as First Amendment rights, once the principle prohibiting coerced speech is in place.

We need not pursue this possibility further for present purposes, because the district court offered additional, independent, reasons for declining to certify the class. It found that Rule 23's requirements were not met because (1) the intraclass conflicts of interest rendered the named plaintiffs inadequate as class representatives, and (2) common questions did not predominate so as to make a class action superior to individual actions.

Looking first at adequacy of representation, we recall that this is one of the four essential criteria established by Rule 23(a) for all class actions: numerosity, adequacy of representation, commonality, and typicality. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). The district court did not abuse its discretion in finding that there are serious intra-class conflicts of interest in the Objectors' proposed class, and that the proposed representatives cannot fairly and adequately protect all prospective members. FED. R. CIV. P. 23(a)(4). "Because a class action is an exception to the usual rule that only

a named party before the court can have her claims adjudicated, the class representative must be part of the class and possess the same interest and suffer the same injury." *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015). "A class is not fairly and adequately represented if class members have antagonistic or conflicting claims." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)).

We addressed intra-class conflicts of interest in a case involving people who declined to join a union nearly two decades ago in *Gilpin v. American Federation of State, Cnty., & Mun. Employees, AFL-CIO,* 875 F.2d 1310 (7th Cir. 1989). There we affirmed a district court's refusal to certify a class of 10,000 non-union members in a suit seeking restitution for fair-share fees deducted following defective notice. We held that the judge was right not to certify the class in that case because of a potentially serious conflict of interest:

> Two distinct types of employee will decline to join the union representing their bargaining unit. The first is the employee who is hostile to unions on political or ideological grounds. The second is the employee who is happy to be represented by a union but won't pay any more for that representation than he is forced to. The two types have potentially divergent aims. The first wants to weaken and if possible destroy the union; the second, a free rider, wants merely to shift as much of the cost of representation as possible to other workers, *i.e.*, union members.

*Id.* at 1313. In so doing, we noted that seeking a restitution remedy was suitable only for the type of plaintiff who is hostile to the unions, and that the windfall of restitution might

embarrass or ruin the union—an outcome that the second type of employees would not want. *Id.*

In a more recent case, *Schlaud v. Snyder*, 785 F.3d 1119 (6th Cir. 2015), our sister circuit affirmed a denial of class certification in similar circumstances, where the plaintiffs challenged fair-share fees and sought to certify a class and a subclass of home childcare workers. The class included workers who were members of the union or voted in favor of the collective bargaining agreement, while the subclass included those who did not have the chance to vote in the union election. *Id.* at 1125–28. The Sixth Circuit emphasized that the plaintiff representatives would have a clear conflict of interest with class members who were union members. *Id.* at 1127. Further, the court noted that when given an opportunity to vote, a significant percentage voted in favor of union representation. *Id.* It was therefore fair to presume that some members of the subclass would have wanted to be members of the union. The Sixth Circuit held that it was not an abuse of discretion to find that the named plaintiffs could not adequately represent the proposed classes or subclasses, as both would have "include[d] members whose 'probable preferences' would have been in conflict … ." *Id.* at 1128.

The situations in both *Gilpin* and *Schlaud* may not be identical to the one before us. But, as the district court rightly noted, "in the end, both *Schlaud* and *Gilpin* point out that a class representative who wants to undermine the union is not likely to be a suitable representative for a group that includes people who have no such hostility." *Riffey v. Rauner*, No. 10 CV 02477, 2016 WL 3165725, at *7 (N.D. Ill. June 7, 2016). As we noted earlier, the Union presented evidence showing that

65% of the potential class members who are still personal assistants have since voted to join SEIU. It also submitted numerous affidavits from would-be class members stating that they supported the union and the fees. This evidence supports the district court's finding of a serious intra-class conflict of interest.

According to the Objectors, there is no conflict of interest, and they are therefore adequate representatives because differences in opinion about the Union have no bearing on the merits of the claim. For this, they cite Eighth Circuit precedent for the notion that "[t]he antagonism which will defeat the maintenance of a class action must relate to the subject matter in controversy, as when the representative's claim conflicts with the economic interests of the class … ." *Reynolds v. Nat'l Football League*, 584 F.2d 280, 286 (8th Cir. 1978) (citation omitted). But in *Reynolds*, the Eighth Circuit was examining the alleged conflict between active and retired football players. It decided that the differences were insufficient to preclude class treatment where "all class members were interested in damages [but] only some were economically interested in future player movement restrictions." *Id.* Here, however, differences in opinion regarding the Union and its activities go to the heart of both the question of consent to the fee collection and to the motivation to seek monetary damages against the Union.

To this concern, the Objectors propose what they see as a simple solution: certify the class that they have proposed and allow members with competing interests (*i.e.*, those who would have supported the Union willingly, or who have since become full Union members) to opt out of the action. The problem with this suggestion is that Rule 23(b)(3)'s opt-out

provisions may operate as a safety valve only for an otherwise properly certified class. In other words, the opt-out procedures are no substitute for adherence to Rule 23; a class must meet Rule 23's requirements *before* class members are allowed to opt out of the action. The plaintiffs' suggestion attempts to foist the burden of fashioning an appropriate class on those who would be required to opt-out. This we cannot allow. It is worth noting, too, that the district court repeatedly invited the Objectors to suggest a more tailored class, but they let that opportunity pass. We therefore have no trouble finding that the district court did not abuse its discretion in finding that the proposed class representatives failed the adequacy requirement of Rule 23(a)(4).

Even if the Objectors had not run into problems with adequacy of representation under Rule 23(a), they would still not clear the class certification hurdles. Because they seek to certify a class for monetary damages, they need to show that the common questions predominate over questions affecting individual members, and that a class action is a superior method to adjudicate the controversy. FED. R. CIV. P. 23(b)(3). The predominance requirement is met when common questions represent a significant aspect of a case and can be resolved for all members of the class in a single adjudication. *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1059 (7th Cir. 2016). As we said in *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012):

> If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it

is an individual question. If the same evidence will suf-
fice for each member to make a prima facie showing,
then it becomes a common question.

*Id.* at 815 (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th
Cir. 2005)). This does not mean that a hint of an individual
question—especially questions regarding damages—is fatal
to class treatment, but common questions must predominate.
*Id.* A district court should review the evidence pragmatically
in order to decide whether class-wide resolution "would sub-
stantially advance the case." *Suchanek v. Sturm Foods, Inc.*, 764
F.3d 750, 761 (7th Cir. 2014).

The district court reasoned that the main issue remain-
ing—compensatory damages—could not be resolved in a sin-
gle adjudication, and that the individual questions for the
over 80,000 potential class members would predominate over
other questions. It acknowledged that this might not be the
issue "if a class were certified solely to adjudicate the affirm-
ative defense of good faith before determining liability," but
the Objectors did not request such a limited class nor did they
brief that possibility. *Riffey*, 2016 WL 3165725, at *8.

As the district court noted, the Supreme Court has re-
solved the overarching common issue in this case: whether
the First Amendment prohibits the fair-share fee deductions
in the absence of affirmative consent (yes). The issue that re-
mains—compensatory damages—requires a showing of ac-
tual injury *caused by* the constitutional deprivation. *Memphis
Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 309 (1986). In order
to recover damages for any monetary loss or emotional suf-
fering, each class member must have suffered a loss, and that
loss must have been caused by the Union's violation of her
First Amendment rights.

We agree with the district court that the question whether damages are owed for many, if not most, of the proposed class members can be resolved only after a highly individualized inquiry. It would require exploration of not only each person's support (or lack thereof) for the Union, but also to what extent the non-supporters were actually injured. The Union would be entitled to litigate individual defenses against each member. This suggests not only that individual questions predominate at this stage of the litigation, but also that it would be difficult to manage the litigation as a class. The plaintiffs offered no plan to make class-wide determinations about support for the collective bargaining representation. The district court was well within the bounds of its discretion to reject class treatment on these bases as well.

Our review of both the facts and the legal arguments the Objectors have presented leaves us satisfied that the district court's decision not to certify their proposed class was a sound one. We therefore AFFIRM the judgment.

MANION, *Circuit Judge*, concurring in the judgment. The Supreme Court's decisions in *Knox v. Service Employees International Union, Local 1000*, 567 U.S. 298 (2012), and *Harris v. Quinn*, 134 S. Ct. 2618 (2014), at the very least mean that public employees who choose not to join a union can't be required to contribute to the union without their affirmative consent. The district court concluded that since many of the home care providers supported the union and didn't oppose the "fair-share" fees, those providers did not accrue a compensable First Amendment injury. The problem, however, is that the care providers, now belatedly called the objectors, were not first given the choice whether or not to pay the fee before the union seized their money. Depriving non-members of the choice whether to pay the fee in the first place is a major fault in the union's collection process. Each and every proposed class member had fees seized without his or her consent. That is enough to establish a compensable injury.

Nevertheless, I concur in the court's judgment. The district court's mistakes led to its erroneous conclusions that the proposed class failed to satisfy two of the four prerequisites for certification under Rule 23(a). However, the district court also concluded under Rule 23(b)(3) that: (1) issues common to class members would not predominate over individual issues; and (2) a class action would not be superior to individual actions. These findings were probably not an abuse of discretion. Therefore, I would affirm the denial of certification on those grounds alone.

The district court first reasoned that because each proposed class member would have to prove that he or she opposed the fair-share fees in order to recover, the proposed class could not meet Rule 23(a)'s commonality requirement.

*Riffey v. Rauner*, No. 10-CV-02477, 2016 WL 3165725, at *6 (N.D. Ill. June 7, 2016). According to the court, an unwilling non-union member is injured by the seizure of his or her money only if the non-member subjectively didn't want to support the union. See *id.* at *3. So in the district court's view, the proposed class action really amounts to about 80,000 individual cases wherein home care providers will have to prove that they didn't want their money transferred to the union. That is not so.

The Supreme Court's *Knox* decision should have settled this question. There, two groups of employees filed a class-action suit against SEIU, alleging that the union unconstitutionally required them to contribute money to SEIU's political activism. *Knox*, 567 U.S. at 305–06. One group of employees had objected to the forced contributions, but the second group had not been given the opportunity to do so. Those in the latter group argued that they should have received a new opportunity to object after SEIU levied a new special assessment. *Id.* The Supreme Court agreed, holding that there was no justification for forcing non-members to opt out of, rather than opt into, the assessment. See *id.* at 312. Significantly, the Court observed that "[a]n opt-out system *creates a risk* that the fees paid by nonmembers will be used to further political and ideological ends with which they do not agree." *Id.* (emphasis added). The same risk—that non-members may be forced to support the union when they don't wish to do so—is present here as well.

As the *Knox* Court rhetorically asked, "isn't it likely that most employees who choose not to join the union that represents their bargaining unit prefer not to pay the full amount of union dues?" *Id.* Of course, the answer is yes, both for the

plaintiffs in *Knox* and the home care providers in this case. It is not controversial to say that most people would prefer not to pay an assessment that isn't required. And even if that weren't so obvious, "[c]ourts 'do not presume acquiescence in the loss of fundamental rights.'" *Id.* (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 526 U.S. 666, 682 (1999)). *Harris* held that the seizure of fair-share fees from objecting home care providers violates the First Amendment. Thus, judges cannot assume that home care providers who declined to join SEIU wanted to give up their right not to pay the fair-share fees when those providers were not given an opportunity to object. That is true even if many non-members were not hostile to the union.

The court's citations to compelled-speech cases like *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), and *Wooley v. Maynard*, 430 U.S. 705 (1977), are inapposite. With respect to injury, these cases present a sort of catch-22. Someone who is not bothered by the compelled speech at issue (e.g., the Pledge of Allegiance in *Barnette* and "Live Free or Die" on a license plate in *Wooley*) is very unlikely to sue. The same is true in Establishment Clause cases, which "are invariably mounted by people offended by the government's association with religion." *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 876–77 (7th Cir. 2012) (en banc) (Posner, J., dissenting). In other words, anyone who challenges the government's actions in such cases by definition has an injury, otherwise they wouldn't have sued. But it doesn't follow that those who choose not to sue have not been harmed. As the court acknowledges, "a requirement to recite the Pledge of Allegiance every morning might impermissibly impinge upon all students' rights to choose whether to do so…." Maj. Op. at 6–

7. I would add that those who choose not to sue are still compelled to speak; they simply don't care enough to seek redress, either because they support the speech or it is not worth their time to complain about it. That doesn't mean that the non-objectors don't have a First Amendment injury, only that they have chosen not to assert one. Their damages might be nominal, but their First Amendment injury exists all the same.

Fortunately, we don't have to deal with that problem in this case because the proposed class members all have tangible monetary injuries. And as the Supreme Court explained, those injuries derive from the exaction of "funds from non-members without their affirmative consent." *Knox*, 567 U.S. at 322. Each and every SEIU non-member had fees exacted without his or her affirmative consent. Some might not care enough to seek redress, but like the students required to recite the Pledge, they have been compelled to speak nonetheless. That is their injury. If (as the union contends) some of the proposed class members really wanted to support SEIU, those individuals are free to not claim their refunds or to donate to the union on their own. That is their prerogative. But after *Knox* and *Harris*, public-sector unions can no longer seize money from non-members without their consent. Therefore, those who had funds unconstitutionally seized may recover their money irrespective of their feelings towards the union.

Next, the district court concluded (and the court apparently agrees) that the representative plaintiffs can't adequately represent the class as required by Rule 23(a)(4) because class members may have differing views about SEIU. The district court reasoned that "a class representative who wants to undermine the union is not likely to be a suitable representative for a group that includes people who have no

such hostility." *Riffey*, 2016 WL 3165725, at *7. That analysis is too broad. A class member who wants to recover his money doesn't necessarily want to undermine the union. He may just not want to pay for what the union labels "fair share," but what the employee thinks is a waste of money.

Moreover, the assumed disagreements between proposed class members have nothing to do with the injury each suffered and the compensation sought. Instead, as the Eighth Circuit explained, "the antagonism which will defeat maintenance of a class action must relate to the subject matter in controversy." *Reynolds v. Nat'l Football League*, 584 F.2d 280, 286 (8th Cir. 1978) (quoting *Sperry Rand Corp. v. Larson*, 554 F.2d 868, 874 (8th Cir. 1977)). Here, the matter in controversy is the refund of seized fair-share fees. Even if some members of the proposed class want to destroy SEIU while others don't, each class member has an identical interest in the return of his or her money. That is to say, none of the representative plaintiffs' claims "conflict[] with the economic interests of the class." *Id.* And unlike in *Gilpin v. American Federation of State, County, & Municipal Employees, AFL-CIO*, 875 F.2d 1310, 1313 (7th Cir. 1989), the putative class representatives seek only compensatory damages, not punitive damages that might cause the union severe economic hardship. See *Riffey*, 2016 WL 3165725, at *7. Differences in ideology among putative class members shouldn't doom an attempt to recover unconstitutionally taken fees in which each member has an equal stake. Cf. *Reynolds*, 584 F.2d at 874 ("the mere existence of political divisions or factionalism within a union does not require class decertification" (quoting *Sperry Rand Corp.*, 554 F.2d at 874)).

However, while I disagree with the district court's conclusions on the issues of commonality and adequacy of representation, I would still affirm its decision not to certify the class. That is because the proposed class still must satisfy Rule 23(b)(3)'s requirement that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Yet as the district court noted, now that the "central First Amendment question" in this case was resolved in *Harris*, "plaintiffs' pursuit of class-wide refunds is the most significant issue remaining in the case." *Riffey*, 2016 WL 3165725, at *8. That's a problem for the plaintiffs. Even though the need for individualized damages calculations won't usually preclude certification, see *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 815 (7th Cir. 2012), in this case damages are the *main*, if not the only, remaining issue. Therefore, the district court likely did not abuse its discretion by concluding that issues common to the class wouldn't predominate over individual issues.

On superiority, the district court was mostly correct that "there is no longer any reason to concentrate each proposed class member's claim for damages into a single forum, because, armed with *Harris*, any individual who did not want to join or support the union can pursue individual relief (with the potential benefit of 42 U.S.C. § 1988 fee-shifting)." *Riffey*, 2016 WL 3165725, at *8 (citation omitted).[1] In other words, especially with prevailing-party attorneys' fees available, it is

---

[1] Of course, as I explained above, any non-member who had his or her fees seized without affirmative consent can recover. Therefore, the class of

not at all obvious that a class action is superior to other available methods for adjudicating this controversy. The individual non-union members might prefer a class action, but they have all the incentive in the world to pursue their individual claims and should not have any trouble finding attorneys to help them in a case where the merits have mostly been decided and fees are recoverable. With that in mind, I would hold that the district court didn't abuse its discretion when it concluded that a class action wouldn't be superior in this case.

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). So while I am particularly troubled by the district court's conclusion that subjective support for the union would extinguish a potential class member's First Amendment injury, I nonetheless agree that we should affirm the denial of certification. Under Rule 23(b)(3), the plaintiffs bear the burden of showing that common issues would predominate over individual ones and that a class action would be superior to individual actions. While the district court's conclusions on these questions are subject to debate, they do not amount to an abuse of discretion. Therefore, I concur only in the judgment.

---

people who may seek relief should not be limited to those "who did not want to join or support the union."