In re Petition for a Rule Change to Create a Voluntary State Bar of Nebraska: to Abolish Neb. Ct. R. Chapter 3, Article 8, and to Make Whatever Other Rule Changes Are Necessary to Transition From a Mandatory to a Voluntary State Bar Association.
___ N.W.2d ___

Filed December 6, 2013.    No. S-36-120001.

1. **Constitutional Law: Attorneys at Law.** A state may constitutionally require a lawyer to be a member of a mandatory or unified bar to which compulsory dues are paid.
2. **Attorneys at Law.** The compelled association of an integrated bar is justified by the state's interest in regulating the legal profession and improving the quality of legal services.
3. **Constitutional Law: Attorneys at Law.** A state may constitutionally fund germane activities out of the mandatory dues of all members.
4. ____: ____. The Nebraska Constitution does not expressly vest the power to define and regulate the practice of law in any of the three branches of government.
5. **Constitutional Law.** In the absence of an express grant of power to any of the three branches of government, the power must be exercised by the branch to which it naturally belongs.
6. **Rules of the Supreme Court: Attorneys at Law.** The Nebraska Supreme Court has the inherent power to promulgate rules providing for an integrated bar.
7. **Constitutional Law: Attorneys at Law.** The practice of law is so intimately connected and bound up with the exercise of judicial power in the administration of justice that the right to define and regulate its practice naturally and logically belongs to the judicial department of our state government.
8. **Constitutional Law.** Compulsory subsidies for private speech are subject to exacting First Amendment scrutiny and cannot be sustained unless two criteria are met. First, there must be a comprehensive regulatory scheme involving a mandated association among those who are required to pay the subsidy. Second, compulsory fees can be levied only insofar as they are a necessary incident of the larger regulatory purpose which justified the required association.

Petition to create voluntary state bar association. Petition granted in part, and in part denied.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Per Curiam.

## INTRODUCTION

Scott Lautenbaugh, a Nebraska attorney (petitioner), filed a petition with this court, asking that we abolish, strike, or repeal

chapter 3, article 8, of the Nebraska Supreme Court Rules, and make whatever other rule changes are necessary to remove any requirement that attorneys licensed in Nebraska be members of the Nebraska State Bar Association (Bar Association). We invited public comment on the petition and, on September 30, 2013, heard oral presentations on behalf of petitioner and the Bar Association.

We deny the petition to create a purely voluntary bar, but we determine that the rules creating and establishing the Bar Association should be amended in the light of developments in compelled-speech jurisprudence from the U.S. Supreme Court since integration of the Bar Association in 1937. In the sections that follow, we (1) recognize the continuing constitutional legitimacy of mandatory or unified state bar associations, (2) recall the constitutional basis for and reasons justifying integration of the bar in 1937, (3) summarize the experience in other jurisdictions, (4) examine the evolution of compelled-speech jurisprudence, and (5) focus on the relevance of "germaneness." Finally, we adopt the administrative changes we deem necessary to serve the important purposes of an integrated bar while both (1) ensuring that the Bar Association remains clearly within the permitted scope of constitutional jurisprudence and (2) avoiding the protracted litigation experienced elsewhere.

## MANDATORY STATE BAR ASSOCIATIONS

[1] Petitioner does not challenge the constitutionality of mandatory state bar associations. Analogizing state bar associations to "union-shop" arrangements, the U.S. Supreme Court established long ago that a state may constitutionally require a lawyer to be a member of a mandatory or unified bar to which compulsory dues are paid.[1]

[2,3] The core of petitioner's grievance in this matter arises out of the 1990 holding of the Supreme Court in

---

[1] *Lathrop v. Donohue*, 367 U.S. 820, 842, 81 S. Ct. 1826, 6 L. Ed. 2d 1191 (1961).

*Keller v. State Bar of California*,[2] where it took up the question of "permissible expenditures" of mandatory bar dues. Relying on *Abood v. Detroit Board of Education*,[3] a governmental employee union case, the Court delineated the First Amendment boundaries of a bar association's expenditures of compulsory dues.

> *Abood* held that a union could not expend a dissenting individual's dues for ideological activities not "germane" to the purpose for which compelled association was justified: collective bargaining. Here the compelled association and integrated bar are justified by the State's interest in regulating the legal profession and improving the quality of legal services. The State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members. It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity. The difficult question, of course, is to define the latter class of activities.[4]

Thus, the Court held, "the guiding standard must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of the legal service available to the people of the State.'"[5]

It is that "difficult question" of the use of mandatory bar dues for "germane" versus "nongermane" activities which, as in some other states, forms the basis for the challenge to Nebraska's mandatory bar which is before us today.

---

[2] *Keller v. State Bar of California*, 496 U.S. 1, 14, 110 S. Ct. 2228, 110 L. Ed. 2d 1 (1990).

[3] *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S. Ct. 1782, 52 L. Ed. 2d 261 (1977).

[4] *Keller v. State Bar of California, supra* note 2, 496 U.S. at 13-14.

[5] *Id.*, 496 U.S. at 14.

## INTEGRATION OF BAR
## ASSOCIATION

In 1937, this court granted a petition to integrate the bar of the State of Nebraska.[6] At that time, the petitioners felt that the majority of the members of the bar favored integration by Supreme Court rule to provide better service to the public by the legal profession, to combat the unauthorized practice of law, and to improve the ethical standards of the profession.[7] In general, the 1937 petition sought rules of this court providing for the regulation of the bar of this state.

[4-7] In that proceeding, this court for the first time pondered its power to integrate the bar by rule of the court, noting that the Nebraska Constitution did not expressly vest the power to define and regulate the practice of law in any of the three branches of government. We reasoned that in the absence of an express grant of power to any of the branches, the power must be exercised by the branch to which it naturally belonged. In concluding that this court had the inherent power to promulgate rules providing for an integrated bar, we explained that we had the exclusive power to regulate the conduct and qualifications of attorneys as officers of the court, that the proper administration of justice was the main business of a court, and that "[t]he practice of law is so intimately connected and bound up with the exercise of judicial power in the administration of justice that the right to define and regulate its practice naturally and logically belongs to the judicial department of our state government."[8] Because the bench and bar were so intimately related, we concluded that the problems of one were the problems of the other.

In our 1937 opinion, this court set forth the initial rules creating, controlling, and regulating the Bar Association. We formed the Bar Association "[f]or the advancement of the administration of justice according to law, and for the

---

[6] See *In re Integration of Nebraska State Bar Ass'n*, 133 Neb. 283, 275 N.W. 265 (1937).

[7] *Id*.

[8] *Id*. at 289, 275 N.W. at 268.

advancement of the honor and dignity of the legal profession, and encouragement of cordial intercourse among the members thereof, for the improvement of the service rendered the public by the Bench and Bar . . . ."[9] At that time, those persons who were residents of Nebraska licensed to practice law in the state constituted the membership of the Bar Association. All members were compelled to pay dues.

In that same opinion, we also observed that our inherent power to integrate the bar included the authority to rescind the rules providing for integration. We stated, "In the event of a failure of the plan to function as hoped, it can be corrected or abandoned by the amendment or revocation of the rule by the court in the exercise of its sound judicial discretion."[10] This petition presents the first attempt before this court to eliminate the mandatory bar in Nebraska.

## ACTIONS ELSEWHERE TO ELIMINATE MANDATORY BAR

Other jurisdictions have been confronted with actions to abolish the mandatory bar. Thirty-two states and the District of Columbia require attorneys to become members of a bar and to pay dues as a condition of practicing law in that jurisdiction.[11] Aside from the temporary suspension of mandatory bar membership by the Wisconsin Supreme Court from 1988 to 1992, discussed in more detail below, no state association has converted from mandatory to voluntary status.[12] We note that the mandatory status of the Puerto Rico Bar Association was eliminated in 2009 by an act of the legislature,[13] and the

---

[9] *Id.* at 291, 275 N.W. at 269. See, also, Neb. Ct. R. § 3-802(A).

[10] *Id.* at 290, 275 N.W. at 269.

[11] Ralph H. Brock, "*An Aliquot Portion of Their Dues:*" *A Survey of Unified Bar Compliance with* Hudson *and* Keller, 1 Tex. Tech J. Tex. Admin. L. 23 (2000); ABA Division for Bar Services, *2011 State and Local Bar Membership, Administration and Finance Survey* (2012).

[12] The Strategic Planning Committee of the State Bar of Wisconsin, Future of the State Bar: Mandatory/ Voluntary Membership Report (February 2010), http://www.wicourts.gov/supreme/docs/ 1101petitionreport.pdf (last visited Dec. 2, 2013).

[13] See 2009 P.R. Laws 121, § 2, and 2009 P.R. Laws 135, § 2.

law in Puerto Rico now provides for voluntary membership.[14] However, in September 2013, legislation was filed to return to mandatory bar membership.[15]

We briefly recount recent efforts in Wisconsin, New Mexico, and New Hampshire to eliminate the mandatory state bar.

## WISCONSIN BAR ASSOCIATION

Integration of the bar in Wisconsin has been a contentious matter from the beginning. Upon the first motion seeking integration, the Supreme Court of Wisconsin postponed the matter to a time after the lawyers in military service returned home from World War II.[16] When the matter of integration next came before the Supreme Court of Wisconsin, the court concluded that a voluntary bar was preferable and that the bar should not be integrated.[17] But upon the third motion for integration, the Supreme Court of Wisconsin determined that the bar should be integrated when proper rules and procedures had been adopted by further order of the court.[18] Thus, the Wisconsin bar became an integrated bar on January 1, 1957, under rules and bylaws promulgated by the court.[19] The U.S. Supreme Court later upheld a constitutional challenge to integration of the bar's membership.[20]

The Supreme Court of Wisconsin had further opportunities to consider whether the bar should remain integrated. In 1977[21] and again in 1980,[22] the court approved continuation of the integrated bar.

---

[14] P.R. Laws Ann. tit. 4, § 774 (2013).

[15] See P.R. S.B. PS 729 (Sept. 6, 2013).

[16] See *Integration of Bar Case*, 244 Wis. 8, 11 N.W.2d 604 (1943).

[17] See *In re Integration of Bar*, 249 Wis. 523, 25 N.W.2d 500 (1946), *overruled in part, In re Integration of Bar*, 5 Wis. 2d 618, 93 N.W.2d 601 (1958).

[18] See *In re Integration of Bar*, 273 Wis. 281, 77 N.W.2d 602 (1956).

[19] See *Lathrop v. Donohue, supra* note 1.

[20] See *id*.

[21] See *In re Regulation of the Bar of Wisconsin*, 81 Wis. 2d xxxv (1977).

[22] *Matter of Discontinuation of Wis. State Bar*, 93 Wis. 2d 385, 286 N.W.2d 601 (1980).

A challenge to the constitutionality of the integrated bar led to a temporary suspension of mandatory membership. In *Levine v. Supreme Court of Wisconsin*,[23] a federal district court found that the mandatory membership requirement violated the litigant's First Amendment rights of free speech and free association and was not justified by a compelling state interest. As a result, the Supreme Court of Wisconsin suspended enforcement of its mandatory bar membership rules.[24] On appeal, the Seventh Circuit reversed, concluding that *Lathrop v. Donohue*[25]—which upheld the constitutionality of integration—was binding precedent.[26] The Supreme Court of Wisconsin reinstated the integrated bar effective July 1, 1992.[27]

The bar in Wisconsin remains mandatory amid unrest. A member satisfaction survey conducted for the bar in 2008 revealed that a majority of the respondents—57 percent—would vote for a voluntary association if given the opportunity to do so.[28] In July 2011, two attorneys filed a petition renewing their request that the Supreme Court of Wisconsin abolish the integrated bar.[29] The court, with three justices dissenting, denied the petition without a public hearing.[30]

## STATE BAR OF NEW MEXICO

In 2003, two petitioners sought to modify a New Mexico Supreme Court rule[31] to change the bar from a mandatory bar to a voluntary bar. In response to the petition, the Board of

---

[23] *Levine v. Supreme Court of Wisconsin*, 679 F. Supp. 1478 (W.D. Wis. 1988).

[24] *In Matter of State Bar of Wisconsin*, 169 Wis. 2d 21, 485 N.W.2d 225 (1992).

[25] *Lathrop v. Donohue, supra* note 1.

[26] *Levine v. Heffernan*, 864 F.2d 457 (7th Cir. 1988).

[27] *In Matter of State Bar of Wisconsin, supra* note 24.

[28] The Strategic Planning Committee of the State Bar of Wisconsin, *supra* note 12.

[29] Wis. S. Ct. Order 11-04 (June 6, 2012).

[30] *Id*.

[31] Rule 24-101 NMRA.

Bar Commissioners of the State Bar of New Mexico identi-
fied policy supporting a mandatory bar, such as a mandatory
bar's being more able to promote justice and the legal system's
ability to make justice obtainable. The board also identified
policies supporting a voluntary bar, including the freedom of
association and a voluntary bar's freedom and independence
from the court. The New Mexico Supreme Court denied the
petition without a public hearing.

## New Hampshire Bar
### Association

In New Hampshire, the bar was first unified in 1968
for a trial period of 3 years.[32] The Supreme Court of New
Hampshire reasoned that mandatory membership was "an
integral part of the inherent power of this court to regulate the
practice of law and to supervise" those engaging in the prac-
tice.[33] In 1972, the court reexamined unification, concluded
that the New Hampshire Bar Association had benefited from
the trial experience, and ordered the bar unified on a perma-
nent basis.[34]

During the 2003 legislative session, the New Hampshire
General Court enacted legislation which purported to require
the bar association to place on the ballot with the election of
the association's officers the question of whether membership
in the bar association should be required.[35] The bar association
brought an original action challenging the constitutionality of
the legislative act, and the Supreme Court of New Hampshire
declared the statute to be unconstitutional.[36] The court rea-
soned that "because we have elected to regulate the practice
of law through unification, [the statute at issue], which permits
de-unification without our involvement and contrary to our

---

[32] *In re Unification of the New Hampshire Bar*, 109 N.H. 260, 248 A.2d 709
(1968).

[33] *Id.* at 264, 248 A.2d at 712.

[34] *In re Unified New Hampshire Bar*, 112 N.H. 204, 291 A.2d 600 (1972).

[35] See *In re Petition of New Hampshire Bar Ass'n*, 151 N.H. 112, 855 A.2d
450 (2004).

[36] *Id.*

specific order, encroaches upon inherent judicial authority."[37] The bar remains unified.[38]

### FIRST AMENDMENT
### COMPELLED-SPEECH
### JURISPRUDENCE

Mandatory bars present issues under the First Amendment to the U.S. Constitution because members are required to join the group—and pay dues—in order to practice law. "These requirements implicate the First Amendment freedom of association, which includes the freedom to choose not to associate, and the First Amendment freedom of speech, which also includes the freedom to remain silent or to avoid subsidizing group speech with which a person disagrees."[39]

Since the integration and creation of our Bar Association in 1937, the legal landscape concerning compelled speech has evolved. As discussed below, the U.S. Supreme Court has determined that some mandatory associations, such as some unions and state bar associations, do not violate the First Amendment, because the forced speech serves legitimate purposes for the benefit of its entire membership. The critical inquiry in forced speech cases is whether the speech or activity being "forced" on the dissenting member is "germane" to the "group's constitutionally permissible purposes."[40] In *Lathrop*,[41] a Wisconsin attorney argued that his compelled membership in the state bar violated his rights under the 14th Amendment to the U.S. Constitution because the bar engaged in political activities which he opposed. The U.S. Supreme Court reasoned that the bulk of the bar's activities served the function of elevating the educational and ethical standards of the bar in order to improve the quality of legal services available to the citizens of the state. The Court stated:

---

[37] *Id*., 151 N.H. at 119, 855 A.2d at 456.

[38] ABA Division for Bar Services, *supra* note 11.

[39] *Kingstad v. State Bar of Wis*., 622 F.3d 708, 712-13 (7th Cir. 2010).

[40] 1 Rodney A. Smolla, Smolla and Nimmer on Freedom of Speech § 4:26 (2013), *available at* Westlaw FREESPEECH.

[41] *Lathrop v. Donohue, supra* note 1.

> We think that the Supreme Court of Wisconsin, in order to
> further the State's legitimate interests in raising the qual-
> ity of professional services, may constitutionally require
> that the costs of improving the profession in this fashion
> should be shared by the subjects and beneficiaries of the
> regulatory program, the lawyers, even though the organi-
> zation created to attain the objective also engages in some
> legislative activity.[42]

The Court found no violation of the 14th Amendment by the
requirement that lawyers practicing in the state become mem-
bers of the state bar and pay reasonable annual dues, but the
Court reserved judgment on the attorney's claim that his free
speech rights were violated by the bar's use of his mandatory
dues to support political activities.

In *Abood v. Detroit Board of Education*,[43] every local gov-
ernmental employee represented by a union, even though not a
union member, was required to pay to the union, as a condition
of employment, a service fee equal in amount to union dues.
The U.S. Supreme Court considered whether that arrangement
violated the constitutional rights of employees who object to
public-sector unions or to various union activities financed by
the compulsory service fees. The Court reasoned:

> We do not hold that a union cannot constitutionally
> spend funds for the expression of political views, on
> behalf of political candidates, or toward the advance-
> ment of other ideological causes not germane to its
> duties as collective-bargaining representative. Rather,
> the Constitution requires only that such expenditures be
> financed from charges, dues, or assessments paid by
> employees who do not object to advancing those ideas
> and who are not coerced into doing so against their will
> by the threat of loss of governmental employment.[44]

Thus, the Court held that the agency-shop clause was valid
insofar as the service fees were used to finance expenditures

---

[42] *Id.*, 367 U.S. at 843.

[43] *Abood v. Detroit Board of Education, supra* note 3.

[44] *Id.*, 431 U.S. at 235-36.

by the union for purposes of collective bargaining, contract administration, and grievance adjustment.

In *Teachers v. Hudson*,[45] employees who did not belong to a union challenged the procedure used to determine the proportionate share that they were required to contribute to support the union as a collective bargaining agent, alleging that it violated their 1st and 14th Amendment rights and permitted the use of their proportionate shares for impermissible purposes. The U.S. Supreme Court held that "the constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending."[46]

As noted at the outset of our opinion, it is the seminal and oft-cited case of *Keller v. State Bar of California*[47] which is the foundation of this petition and, indeed, most claims challenging mandatory state bar associations. In *Keller*, members of the State Bar of California sued the bar, alleging that it violated their rights under the First Amendment by using their membership dues to finance certain ideological or political activities to which they were opposed. The Supreme Court observed that the relationship of a state bar and its members was analogous to the relationship of employee unions and their members and that agency-shop laws were enacted to prevent those who receive the benefit of union negotiation but who do not join the union and pay dues from avoiding paying their fair share of the cost of a process from which they benefit.

Furthermore, the Court stated that it was appropriate that all of the lawyers who derive benefits from being admitted

---

[45] *Teachers v. Hudson*, 475 U.S. 292, 106 S. Ct. 1066, 89 L. Ed. 2d 232 (1986).

[46] *Id.*, 475 U.S. at 310.

[47] *Keller v. State Bar of California, supra* note 2.

to practice law "should be called upon to pay a fair share of the cost of the professional involvement in this effort."[48] The Supreme Court determined:

> [T]he compelled association and integrated bar are justified by the State's interest in regulating the legal profession and improving the quality of legal services. The State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members. It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity.[49]

In order to define activities not germane to the bar association's goals, the guiding standard is "whether the challenged expenditures are necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of the legal service available to the people of the State.'"[50] The Court declared that "an integrated bar could certainly meet its *Abood* obligation by adopting the sort of procedures described in *Hudson*."[51]

*United States v. United Foods, Inc*.[52] teaches that the test to determine what group speech is constitutionally permissible is not whether the speech is political or ideological in nature, but, rather, whether the speech is germane. The Supreme Court iterated that "speech need not be characterized as political before it receives First Amendment protection"[53] and that "[l]awyers could be required to pay moneys in support of activities that were germane to the reason justifying the compelled association in the first place, for example,

---

[48] *Id*., 496 U.S. at 12.

[49] *Id*., 496 U.S. at 13-14.

[50] *Id*., 496 U.S. at 14.

[51] *Id*., 496 U.S. at 17.

[52] *United States v. United Foods, Inc*., 533 U.S. 405, 121 S. Ct. 2334, 150 L. Ed. 2d 438 (2001).

[53] *Id*., 533 U.S. at 413.

expenditures . . . that related to 'activities connected with dis-ciplining members of the Bar or proposing ethical codes for the profession.'"[54]

The germaneness of an expenditure by a mandatory bar for a nonideological activity was considered in *Romero v. Colegio de Abogados de Puerto Rico*.[55] In that case, the mandatory bar in Puerto Rico required members to purchase life insurance from its group life insurance program. There was no provision which would allow a member to refuse the life insurance and retain the portion of the member's dues that would otherwise have been spent on life insurance premiums. The First Circuit determined that the required payment for group life insurance was unconstitutional, because it was not germane to the bar association's purpose of regulating the legal profession and improving the quality of legal services. As the First Circuit stated, "[T]hat an individual may be compelled to associate and financially contribute for some purposes does not mean she may be compelled to associate and financially contribute for all purposes."[56]

Likewise, in *Kingstad v. State Bar of Wis.*,[57] three Wisconsin attorneys objected to the state bar's use of a portion of their mandatory dues to fund a public image campaign. The Seventh Circuit held that in order to withstand scrutiny under the First Amendment, expenditures by the state bar which are funded by mandatory dues must be germane to legitimate purposes of the bar, regardless of the ideological and political nature of the activity. In other words, a bar member may not, under *Kingstad*, be compelled to subsidize "nongermane" activities of any type. The Seventh Circuit determined, however, that the disputed public image campaign—which had the goal of improving the public's perception of Wisconsin lawyers—was germane to the legitimate purposes of the bar, because the

---

[54] *Id.*, 533 U.S. at 414.

[55] *Romero v. Colegio de Abogados de Puerto Rico*, 204 F.3d 291 (1st Cir. 2000).

[56] *Id.* at 301.

[57] *Kingstad v. State Bar of Wis.*, *supra* note 39.

expenditure was reasonably related to the purpose of improving the quality of legal services.

Most recently, the legal landscape was again altered to some degree with *Knox v. Service Employees Intern. Union*,[58] wherein the U.S. Supreme Court considered whether a union could require objecting nonmembers to pay a special fee for the purpose of financing the union's political and ideological activities without running afoul of the First Amendment. The Supreme Court recalled that it had held "[t]he First Amendment . . . does not permit a public-sector union to adopt procedures that have the effect of requiring objecting nonmembers to lend the union money to be used for political, ideological, and other purposes not germane to collective bargaining."[59]

The *Knox* Court cast doubt on the constitutional validity of opt-out systems for dissenting members. The Court stated, "By authorizing a union to collect fees from nonmembers and permitting the use of an opt-out system for the collection of fees levied to cover nonchargeable expenses, our prior decisions approach, if they do not cross, the limit of what the First Amendment can tolerate."[60] The *Knox* Court further stated, "Our cases have tolerated a substantial impingement on First Amendment rights by allowing unions to impose an opt-out requirement at all."[61] With regard to the collection of special assessment dues at issue in *Knox*, the Court determined that "the union should have sent out a new notice allowing nonmembers to opt in to the special fee rather than requiring them to opt out."[62] We note that the *Knox* Court did not strike down the use of an opt-out system altogether, but the concurrence points out that its continued viability is in doubt, stating that "while the majority's novel rule is, on its face, limited to

---

[58] *Knox v. Service Employees Intern. Union*, ___ U.S. ___, 132 S. Ct. 2277, 183 L. Ed. 2d 281 (2012).

[59] *Id*., 132 S. Ct. at 2284-85.

[60] *Id*., 132 S. Ct. at 2291.

[61] *Id*., 132 S. Ct. at 2293.

[62] *Id*.

special assessments and dues increases, the majority strongly hints that this line may not long endure."[63]

## RELEVANCE OF "GERMANENESS"

The proponents and opponents of the mandatory bar disagree on the relevance of germaneness under *Keller*[64] and *Kingstad*.[65] The Bar Association contends that *Keller* and its progeny require only that objecting members not be required to pay for nongermane political and ideological lobbying. Contrarily, an opponent of the mandatory bar argues that under *Kingstad*, it is no longer enough that an objecting member's mandatory dues not be used for ideological and political activities by the Bar Association; rather, the mandatory dues must be used only for germane purposes, regardless of the nature of the activity.[66]

One commentator and supporter of the mandatory bar, who submitted comments on behalf of the Bar Association, concedes that *Kingstad* is a "partially contrary opinion" to the bar's view that *Keller* focuses primarily on the political or ideological nature of the bar's activities, not its germaneness.[67] In other words, the Bar Association believes that it can use mandatory dues to finance "nongermane" activities so long as the activities are not "political and ideological."[68] It is urged that *Kingstad* is a misinterpretation of *Keller* and its progeny. That argument is premised on the view that the U.S. Supreme Court's "characterization of *Keller*" in *United Foods, Inc.*,[69]

---

[63] *Id.*, 132 S. Ct. at 2299 (Sotomayor, J., concurring in the judgment; Ginsburg, J., joins).

[64] *Keller v. State Bar of California, supra* note 2.

[65] *Kingstad v. State Bar of Wis., supra* note 39.

[66] See comment letter from James C. Creigh to Clerk of the Nebraska Supreme Court and Court of Appeals (May 29, 2012) (on file in case No. S-36-120001).

[67] Letter from Prof. Michael Fenner, Creighton Univ. School of Law, to Jane Schoenike, Exec. Dir., Nebraska State Bar Assn. (Feb. 15, 2012) (on file in case No. S-36-120001).

[68] *Id.*

[69] *United States v. United Foods, Inc., supra* note 52.

the principal foundation of the *Kingstad* holding, cannot be used to support a "limitation on non-ideological and non-political speech expenditures" of a bar association because it takes that characterization "out of context and tries to make it stand for too much."[70]

[8] However, the *Kingstad* analysis and its reliance on *United Foods, Inc.* appear to be reinforced by the U.S. Supreme Court's recent *Knox* opinion. The *Knox* Court explained its decision in *United Foods, Inc.* as follows:

> We made it clear that compulsory subsidies for private speech are subject to exacting First Amendment scrutiny and cannot be sustained unless two criteria are met. First, there must be a comprehensive regulatory scheme involving a "mandated association" among those who are required to pay the subsidy. . . . Such situations are exceedingly rare because, as we have stated elsewhere, mandatory associations are permissible only when they serve a "compelling state interes[t] . . . that cannot be achieved through means significantly less restrictive of associational freedoms." . . . Second, even in the rare case where a mandatory association can be justified, compulsory fees can be levied only insofar as they are a "necessary incident" of the "larger regulatory purpose which justified the required association."[71]

That second criterion set forth in *Knox* reinforces the *Kingstad* "germaneness" analysis and the significance of that factor in protecting "associational freedoms." The two-part *Knox* test focuses directly on the *United Foods, Inc.* characterization of *Keller* despite the "mundane commercial nature of [the] speech."[72]

Thus, there appears to be ample support for the view expressed in *Kingstad* that germaneness is central to a modern view of *Keller*.

---

[70] Fenner, *supra* note 67.

[71] *Knox v. Service Employees Intern. Union*, *supra* note 58, 132 S. Ct. at 2289 (citations omitted).

[72] *Id*.

## ADMINISTRATIVE
## RESOLUTION

Having said all that, however, we need not today decide the precise boundaries of First Amendment compelled-speech jurisprudence in 2013. The nature of the proceeding before this court, i.e., a petition for a rule change under the court's inherent authority, does not require us to resolve a case or controversy between two parties as would a proceeding under this court's appellate or original action jurisdiction. The present petition requires this court to assess the future and the structure of the mandatory bar in Nebraska at an administrative level and determine, based on trends in the law since 1937, how to best meet the needs of the judicial system, Nebraska attorneys, and the citizens of this state.

As noted at the outset, there were several important reasons underlying our 1937 decision to integrate the bar in Nebraska.[73] Those reasons still exist and remain valid justifications for a mandatory bar to this day. This court recognized in 1937 that "a few unethical practitioners ha[d] degraded the public esteem of the bar as a whole."[74] Our decisions in disciplinary cases since 1937 demonstrate the continued necessity of regulating the bar and ensuring that ethical rules for lawyers are maintained and enforced. This court also observed in 1937 that informed public opinion

> favor[ed] bar integration by supreme court rule as a means of providing better service to the public by the legal profession, of effectively combating the unauthorized practice of law, and of improving the ethical standards of the profession and giving to it the high public esteem that it should enjoy.[75]

The demand for additional legal services has grown exponentially since 1937. In this age of instantaneous communications reaching to virtually every household, the need to combat the unauthorized practice of law presents new challenges. And

---

[73] *In re Integration of Nebraska State Bar Ass'n, supra* note 6.

[74] *Id.* at 290, 275 N.W. at 268.

[75] *Id.* at 284, 275 N.W. at 266.

justifying the public's favorable view of the practicing bar remains a vital reason for an integrated bar.

Furthermore, the laws enacted by our Legislature and constitutional provisions adopted by the citizens of this state indicate that the people of Nebraska have come to rely on the existence of the Bar Association and depend upon this court's oversight of that association and the practice of law.[76]

In our view, the best solution is to modify the court's rules creating and establishing the Bar Association (and other related rules) to limit the use of mandatory dues, or assessments, to the regulation of the legal profession. This purpose clearly includes the functions of (1) admitting qualified applicants to membership in the Bar Association, (2) maintaining the records of membership, (3) enforcing the ethical rules governing the Bar Association's members, (4) regulating the mandate of continuing legal education, (5) maintaining records of trust fund requirements for lawyers, and (6) pursuing those who engage in the unauthorized practice of law. The mandatory Supreme Court assessments supporting these functions will be paid to the Bar Association on behalf of the Nebraska Supreme Court in much the same way that the existing disciplinary assessment is administered. By limiting the use of mandatory assessments to the arena of regulation of the legal profession, we ensure that the Bar Association remains well within the limits of the compelled-speech jurisprudence of the U.S. Supreme Court and avoid embroiling this court and the legal profession in unending quarrels and litigation over the germaneness of an activity in whole or in part, the constitutional adequacy of a

---

[76] See, Neb. Const. art. V, § 21(4) (members of "bar of the state" on judicial nominating commissions); Neb. Const. art. V, § 28 (membership of Commission on Judicial Qualifications); Neb. Rev. Stat. §§ 7-204 (Reissue 2012); 20-506 (Supp. 2013); 23-3407 (Reissue 2012); 24-229 (Cum. Supp. 2012); 24-715 (Reissue 2008); 24-806 (Reissue 2008); 24-809 (Reissue 2008); 24-1201 (Reissue 2008); 25-2905 (Reissue 2008); 29-3924 (Reissue 2008); 43-3318 (Reissue 2008); 43-3342.05 (Supp. 2013); 55-422 (Reissue 2010); 76-557 (Reissue 2009); 76-1003 (Reissue 2009); 76-2802 (Reissue 2009); 76-2805 (Reissue 2009); 83-4,124 (Supp. 2013); and 84-1503 (Supp. 2013).

particular opt-in or opt-out system, or the appropriateness of a given grievance procedure.

The remaining activities of the Bar Association will be financed solely by revenues other than mandatory assessments. Obviously, voluntary dues would be a significant portion of those revenues. Voluntary bar dues fall outside the realm of the compelled-speech jurisprudence. Many members of the Bar Association may well elect to pay the voluntary dues assessment—particularly if the Bar Association strictly adheres to the use of such funds for purposes clearly benefiting the bar as a whole and avoids entanglement in ideological or political issues or legislation. The Bar Association has, over the years, developed and administered many laudable and worthwhile programs which have served the legal profession well. The Volunteer Lawyers Project with its legal self-help desks, the Nebraska Lawyers Assistance Program, the Casemaker Digest, its continuing legal education programs, and the SCOPE mentoring program are but a few of the worthy services offered by the Bar Association. Such services and programs and others like them can continue to thrive with the aid of voluntary dues, grants, and gifts from those who choose to support the voluntary components of the Bar Association.

We disagree with the parade of horrors predicted by both petitioner and the Bar Association regarding such an arrangement. Petitioner cautioned during his oral presentation that such a bar would be "cumbersome" compared to a purely voluntary bar. But petitioner's approach fails to preserve the regulatory structure erected beginning in 1937 and would abandon the public's reliance upon the existence of a mandatory bar. And our prior segregation of a bar-disciplinary assessment clearly demonstrates that administrative issues can be managed easily. Thus, we conclude that petitioner's fear is unfounded. The Bar Association, on the other hand, asserted that having to perform an item-by-item germaneness analysis would be "not workable" and "way too expensive." But our approach entirely avoids any such difficulty. We recognize that we have intentionally chosen to draw the line in a manner that forgoes the opportunity to expend mandatory assessments for some

purposes that might well be adjudged as germane. By drawing the line for use of mandatory bar assessments well within the bounds of the compelled-speech jurisprudence, we ensure that the assessments—which will be administered by the Supreme Court—will be used only for activities that are clearly germane. Here again, our experience with the disciplinary assessment shows that this separation between mandatory and voluntary dues can be readily accomplished. And by drawing the line in this way, we will clearly avoid the morass of continuing litigation experienced in other jurisdictions.

## CONCLUSION

Although we reject petitioner's request for complete deunification of the Bar Association, we sustain the petition to the extent that we amend this court's rules to limit the use of mandatory bar dues, now to be referred to as "mandatory membership assessments," to the regulation of the legal profession. The Bar Association may collect voluntary dues to finance nonregulatory activities which may benefit the legal profession as a whole. We attach to this opinion the necessary rule changes in chapter 3, "Attorneys and the Practice of Law," of the Nebraska Supreme Court Rules, which include amendments to the following articles thereof:
• Article 1: Admission Requirements for the Practice of Law;
• Article 3: Discipline Procedures for Lawyers;
• Article 8: State Bar Association; Creation; Control; and Regulation;
• Article 9: Trust Fund Requirements for Lawyers; and
• Article 10: Unauthorized Practice of Law.
• Nebraska Commission on Unauthorized Practice of Law Administrative Rules, Regulations, and Procedures.
The amendments to articles 3 and 8, and the amendments to Neb. Ct. R. §§ 3-100 and 3-1010, shall be effective on January 1, 2014. In order to ensure an orderly transition of administrative functions regarding admissions, trust funds, and the unauthorized practice of law, all other amendments to the rules, regulations, and procedures identified above shall be effective on April 1, 2014.

And we reiterate that the need for further amendments may arise. We have already quoted the recognition in our 1937 opinion that correction or abandonment of a rule may be accomplished by amendment or revocation in the exercise of our sound judicial discretion.[77] While abandonment and revocation are unlikely, correction by amendment may be required as the implementation of these changes progresses.

We recognize that as of the date of issuance of this opinion, the billing statements for bar dues for 2014 have been distributed. Indeed, this court just recently approved the rates for bar dues and the disciplinary assessment required for 2014. Therefore, in order to effectuate the directive of this court based on this opinion and ensure an orderly transition in the structure of the financing of the Bar Association, we direct that the Bar Association conduct, as soon as practicable, a special mailing advising each of its members that (1) the member must pay mandatory membership assessments established by the Supreme Court in the amount appropriate to the member's class of membership as set forth below:

| Membership Class | § 3-100(B) (Adm.) | § 3-301(E) (Discipline) | § 3-1010(B) (UPL) | Total |
|---|---|---|---|---|
| Regular Active | $25.00 | $60.00 | $13.00 | $98.00 |
| Junior Active | $25.00 | $60.00 | $13.00 | $98.00 |
| Senior Active | $25.00 | $60.00 | $13.00 | $98.00 |
| Judicial Active | $25.00 | $60.00 | $13.00 | $98.00 |
| Military Active | 0 | 0 | 0 | 0 |
| Regular Inactive | $12.50 | $30.00 | $ 6.50 | $49.00 |
| Emeritus Inactive | 0 | 0 | 0 | 0 |

(2) the member may elect to pay the voluntary dues component of the Bar Association by paying such voluntary dues in an amount to be established by the Bar Association for the 2014 calendar year, with credit for any amount previously paid in excess of the mandatory membership assessments; and (3) if the member elects not to pay the voluntary dues component, the member shall be entitled to a refund of any amounts

---

[77] See *In re Integration of Nebraska State Bar Ass'n, supra* note 6.

previously paid by the member for the 2014 calendar year in excess of the mandatory membership assessments.

Thus, we grant the petition in part and, in part, deny the petition.

Petition granted in part, and in part denied.

## ATTACHMENT TO CASE NO. S-36-120001

## CHAPTER 3

## ATTORNEYS AND THE PRACTICE OF LAW

## ARTICLE 1

## ADMISSION REQUIREMENTS FOR THE PRACTICE OF LAW

**Preamble.**

. . . .

### § 3-100. Supreme Court jurisdiction.

(A) The Supreme Court exercises jurisdiction over all matters involving the licensing of persons to practice law in the State of Nebraska. Accordingly, the Supreme Court has adopted the following rules governing admission to the practice of law.

(B) Every attorney admitted to practice in the State of Nebraska shall pay a bar admissions assessment for each calendar year from January 1 to December 31, payable in advance on or before January 1 of each year, in such amount as may be fixed by the Court. The first bar admissions assessment shall be due on or before January 1, 2014. In accordance with Neb. Ct. R. § 3-803(D), such assessment shall be paid to the Treasurer of the Nebraska State Bar Association and shall be used to defray the costs of bar admissions administration and enforcement as established by these rules. Different classifications of bar admissions assessments may be established for Active Jr., Active Sr., Active, Inactive, Military, and Emeritus members as those membership classes are defined in Neb. Ct. R. § 3-803. Members newly admitted to the practice of law in

the State of Nebraska shall not pay a bar admissions assessment for the remainder of the calendar year in which they are admitted.

(C) Members who fail to pay the bar admissions assessment shall be subject to suspension from the practice of law as provided in Neb. Ct. R. § 3-803(E).

. . . .

## § 3-103. Director of admissions.

The Supreme Court's shall appoint a director of admissions (director), employed by the Court pursuant to Neb. Ct. R. § 3-803(A)(2), who shall serve under the supervision of the Court and perform such duties for the Commission as these rules may require. The director of admissions shall not be a member of the Commission, but shall, for purposes of these rules, act as the director of the Bar Commission.

. . . .

## § 3-106. Communications in official confidence; immunity.

The records, papers, applications, and other documents containing information collected and compiled by the Commission, its members, its the director, Commission employees, agents, or representatives are held in official confidence for all purposes other than cooperation with another bar licensing authority. Provided, however, that an applicant's appeal to the Supreme Court may result in such communications becoming public record. The Commission, its members, its the director, and all Commission employees, agents, or representatives are immune from all civil liability for damages for conduct and communications occurring in the performance of and within the scope of the Commission's duties relating to the examination, character and fitness qualification, and licensing of persons seeking to be admitted to the practice of law. Records, statements of opinion, and other information regarding an applicant communicated to the Commission by any person or entity, firm, governmental authority, or institution, are privileged, and civil suits for damages predicated thereon may not be instituted.

. . . .

## § 3-115. Reasonable accommodation.

. . . .

(E) **Forms.** All forms necessary to complete a request for special testing accommodations will be available at no charge from the ~~D~~director of the Nebraska State Bar Commission. The applicant may file any additional documentation in support of the request.

. . . .

## APPENDIX C

## POLICY ON APPLICANTS WITH A DISABILITY

. . . .

## IV. COMMISSION DECISIONS

A. Procedures for Review of Requests

. . . .

2. In reviewing a request, the commission will follow these procedures.

(a) The commission will make a determination, and the ~~secretary~~ director of the commission will send notification of the determination to the applicant, no fewer than 25 days before the examination.

. . . .

## APPENDIX D

## NEBRASKA STATE BAR COMMISSION
## EMERGENCY PREPAREDNESS PLAN

. . . .

**Policies and Procedures to Be Followed in
Case of Emergencies**

During the examination, the Site Supervisor and staff members will be wearing radios so they can be immediately contacted in the event of an emergency. The Site Supervisor must rapidly go to the site of any incident or emergency and quickly assess the situation. If the situation requires it, 911 should be called

immediately. The safety of the applicants, proctors, and staff is always of primary concern. The ~~Executive Director~~ director of admissions must be contacted promptly and given a report of the incident or emergency. If 911 is called, the Site Supervisor should immediately notify facility staff so that they can assist in meeting the emergency personnel and directing them to the appropriate location.

In any situation where a dispute arises, the Site Supervisor or staff member should attempt to calm the applicant and inform the applicant that the matter is being reported to the ~~Executive Director~~ director of admissions so that a decision can be made on how to proceed. As with any incident, the "Emergency Report" form (Form A) should be completed by the Site Supervisor as soon as possible.

. . . .

**Delayed Starting Time**

While there may be very good reasons for delaying the examination, every attempt should be made to start the examination on time. If time permits, the Site Supervisor should contact the ~~Executive Director~~ director of admissions to report the delay and get instructions on when to begin the afternoon session. The ~~Executive Director~~ director of admissions will advise of the correct action to take, but in any event, the afternoon session should not begin less than 1 hour after the applicants have been dismissed from the morning session.

In the event of a natural disaster, the ~~Executive Director~~ director of admissions should be contacted prior to the start of the examination, as soon as the problem is identified. If the decision is made to give all applicants extra time, the Speaker will be directed to make such an announcement. If a decision is made to give individual applicants extra time, a board staff member will advise each affected applicant that he/she has been granted a certain amount of extra time. The applicant will be instructed to continue the examination after the other applicants have been dismissed. The applicant will be stopped individually when the extra time is up.

**Extended Time**

Generally, extended time to complete an examination session by the amount of time lost due to a personal incident is not given.

If it is determined that a Major Disruption has occurred or that a small number of applicants have been negatively affected by a circumstance beyond their control and that it is possible to maintain the integrity of the testing environment, then the examination can be stopped for up to 1½ hours if the test site can accommodate the extended time. The Speaker should begin to read the disruption text that is attached as Appendix A to this Emergency Preparedness Plan. This should only be read after receiving instructions from the ~~Executive Director~~ director of admissions to do so.

. . . .

**Restart or Dismiss**

After a determination to stop an examination has been made, the ~~Executive Director~~ director of admissions needs to determine whether to restart the examination or dismiss the examinees for the session. An examination can be restarted after the following criteria have been considered:

. . . .

**Disputed Time Announcements**

The Site Supervisor is responsible for the accuracy of time announcements. The Site Supervisor will stand at the podium to ensure the announcements are the correct time and given at the appropriate time. If an applicant disputes a time announcement, the Site Supervisor should be contacted immediately. The Site Supervisor should report any such dispute to the ~~Executive Director~~ director of admissions and complete a "Record of Irregularity" form (Form B).

**Flooding, Etc., at Facility**

As soon as such an incident is determined, the Site Supervisor must contact the ~~Executive Director~~ director of admissions immediately. Several proctors should be assigned to the

entrances of the examination room to advise the applicants that the situation is being assessed and further information will be provided as soon as it becomes available. Facility staff should be contacted immediately to determine what can be done to rectify the situation and make whatever arrangements are necessary to start the examination on time or as close to on time as possible.

**Fire Drills**

The Site Supervisor should immediately determine if the fire alarm is a drill or an actual alarm. If it is a drill, the Site Supervisor should immediately contact facility staff and have the alarm shut off. The ~~Executive Director~~ <u>director of admissions</u> should then be contacted to determine if the disruption was significant enough to warrant the granting of additional testing time. If the alarm is valid, the procedures for the evacuation of the facility, stated below, should be followed.

**Evacuation of Facility**

Before the examination, you should review the set-up diagram of the facility to familiarize yourself with the location of all exits. If time permits, the ~~Executive Director~~ <u>director of admissions</u> should be contacted immediately and evacuation procedures should be followed. The examination must be stopped and the time noted. The proctors should begin to move the applicants out of the building. The applicants may resist all efforts to be "herded." However, sufficient presence should be displayed to avoid panic. A calm, solicitous approach, suggesting that the orderly and rapid exit and reassembly is to the applicant's personal advantage is much more likely to result in a successful emergency exit than is an attitude on the part of the proctors which tends to demand military precision or gives the impression of such demands. If there is time, proctors should collect all examination materials. If there is a threat of fire, the last person out should close the doors. If there is a bomb threat, the doors should be left open.

. . . .

### Noise From Another Group Using Facility

The Site Supervisor must go directly to the facility staff and demand that the noise he stopped. If the facility staff does comply with the demand, the ~~Executive Director~~ director of admissions should be contacted as soon as the problem has been resolved with the action that was taken. If the facility staff refused to comply with the demand, the Site Supervisor must contact the ~~Executive Director~~ director of admissions immediately.

When noise problems occur outside of the facility, the Site Supervisor must immediately go to the source of the noise and attempt to get the noise stopped. The Site Supervisor should then return to the room and make notes regarding the problem. An exact diagram of the room should be drawn so that the ~~Executive Director~~ director of admissions will know exactly which of the applicants were affected by the noise problem. Make sure proctors in the area write a detailed incident report on the "Record of Irregularity" form (Form B). If the Site Supervisor is unsuccessful in stopping the noise, the ~~Executive Director~~ director of admissions should be contacted to determine a course of action. Any of the Applicants who complain should be moved to another area if there is space available. It may be determined that the examination will be stopped until the noise ceases; however, the ~~Executive Director~~ director of admissions can only make that decision.

### Electrical Problems

. . . .

In the event of a power outage, the exact time of the outage and the length of time of the outage should be documented. The Site Supervisor should notify the ~~Executive Director~~ director of admissions immediately of any such outage. The applicants should be given additional time that is equal to the length of time of the outage.

Please note: The Site Supervisor should first check to see if the electrical problem may have been caused by plugs being kicked out of wall or floor outlets.

### Applicants Leaving Examination Room

Any applicant who leaves the examination room prior to completing the session should not be readmitted. If he/she objects, the ~~Executive Director~~ director of admissions should be contacted immediately to report the situation and ask for guidance.

. . . .

### MBE Answer Sheet

If an applicant marks circles (M/C) in their question book, contact the ~~Executive Director~~ director of admissions for guidance.

. . . .

### People Wanting to Learn Whereabouts of Applicants

All applicant information is confidential, and no staff member or proctor is to release any information regarding the whereabouts of an applicant. If the inquirer states that it is an emergency, the information should be taken and the ~~Executive Director~~ director of admissions must be contacted immediately for further guidance. No indication is to be given regarding whether or not an applicant is present. These instructions relate to the media and law enforcement personnel as well.

### Possible Imposters

In the possibility that an imposter is suspected of taking the examination for someone else, the incident must be well documented. The Site Supervisor and the Section Supervisor must provide a detailed description of the applicant; carefully observe the applicant involved and state, in detail, the reason for suspecting that the applicant is an imposter. Do not interrupt the applicant or otherwise disturb him/her. During the roll call portion of the examination, the Section Supervisor should pay extra attention that the photo identification provided is valid. The ~~Executive Director~~ director of admissions should be contacted immediately to report the suspected imposter. The Site Supervisor should clandestinely take the suspected imposter's photograph with the digital camera (at each test site).

. . . .

### Complaints of Harassment by Proctors

The Site Supervisor should go to the spot and observe the situation. After the session is complete, he/she should interview the complaining applicant. The Site Supervisor should not get involved with an argument or take either side. It is his/her primary responsibility to calm both parties and gather facts.

The Site Supervisor should advise the complaining applicant that the matter will be reported in detail to the ~~Executive Director~~ director of admissions and that if he/she wishes to file an additional statement, it should be forwarded to the ~~Executive Director~~ director of admissions. The Site Supervisor should offer to move the applicant to a vacant seat in another section. The Site Supervisor should get a detailed account of the incident from the proctor and submit it in conjunction with his/her report of the incident.

### Unruly Applicants

The Site Supervisor and security personnel should observe the applicant and immediately determine if the applicant should be moved to another area of the testing room, or escorted out of the testing room. The Site Supervisor should contact the ~~Executive Director~~ director of admissions prior to having the applicant leave the testing room.

. . . .

### Typographical Errors

If such an error is reported, the ~~Executive Director~~ director of admissions should be contacted immediately. Make no comment to any proctor or applicant regarding the error. Advise anyone inquiring about the error that the matter is being reported and that they should answer the question as stated. If the applicant feels there is an issue, the applicant should submit a detailed written description to the ~~Executive Director~~ director of admissions immediately after the bar examination has concluded.

### Receipt of Threat to Safety

Notice of the possibility of a condition that might require the emergency exit from an examination site can arrive from

a variety of sources. Possibly an applicant may return from lunch with a rumor of a planned disruption which he or she has overheard. A member of the facility staff may report some reference to an emergency. A bomb threat might be incoming on the telephone. Irrespective of the source and nature of the information received, the recipient should gain all possible information. The "Response to Personally Delivered Threat Information" form (From D) should be made available in all sections. Upon rapid, thorough, and accurate completion of the form, it should be quickly hand-delivered to either the ~~Executive Director~~ director of admissions or Site Supervisor, whoever happens to be the most readily available.

In the event the threat is such that the site will probably be uninhabitable preventing reentry, a dismissal exit should occur, but must first be approved by the ~~Executive Director~~ director of admissions. The time remaining in the session would also be a consideration. If there is only the threat of unknown validity, the emergency should be thoroughly analyzed before the exit is ordered.

**Death or Serious Injury Notification**

. . . .

The ~~Executive Director~~ director of admissions must be advised before any action is taken or the applicant is notified. The ~~Executive Director~~ director of admissions or, if delegated, the Site Supervisor will personally make the notification. . . .

**Media Coverage (TV, Newspapers, Magazines, Etc.)**

If media personnel, such as reporters or camera men, are present at the bar examination site, the Site Supervisor or his/her designee must notify the ~~Executive Director~~ director of admissions as soon as possible. Only the Site Supervisor is authorized to speak to the media and then, can ONLY discuss topics regarding general bar examination information that could be found on the Board's Web site. It must be remembered that ALL applicant information, including their identity, is confidential. . . .

## NEBRASKA STATE BAR COMMISSION
## EMERGENCY REPORT

Name of Emergency: _____
_____
_____
Number of Applicants affected: _____
Location of Test Site: _____
Proximity of Emergency to Other Applicants: _____
Did Applicants leave their seats?: _____ If so, how
many?: _____
Examination numbers of applicants who left their seat: _____
Did other Applicants assist?: _____
Examination numbers of applicants who assisted: _____
_____
What time did it occur?: _____ How much
time was left in the session?: _____
What portion of the examination was being administered (PT,
Essay, MBE)?: _____
Was there excessive noise?: _____ If so, describe
in detail: _____
_____
Other relevant details?: _____
_____
_____
Time ~~Executive Director~~ director of admissions was called:
_____
Time ~~Executive Director~~ director of admissions returned call
with instructions on how to proceed: _____
Decision was: _____
_____
_____


FORM A
(Emergency Preparedness Plan)

. . . .

## NEBRASKA BAR COMMISSION
## DISRUPTION TEXT

(To be used in instances where a disruption has occurred and stopping of the examination is required.)

Stop writing (typing) now. I repeat, stop writing (typing) now. Put your pencils (pens) down and do not make any further marks on your examination papers until you are told to begin writing (typing). Please do not converse with other applicants or leave your seat. A disruption has occurred at this examination site. It is the decision of the ~~Executive Director~~ director of admissions that this examination session be temporarily stopped until the disruption is dealt with. I repeat, it is the direction of the ~~Executive Director~~ director of admissions that this examination session be temporarily stopped until the disruption is dealt with.

(Describe the disruption if appropriate.)

Again, do not converse with other applicants or leave your seat. I will keep you updated regarding the situation as information is relayed to me.

(Keep repeating sequences advising them not to write (type), talk or leave their seats, if you are advised to evacuate the test site, refer to the exit text.)

(If you are advised to restart the examination.)

(Describe how the disruption has been dealt with.)

(Announce)

Due to the disruption, applicants at this test site will receive _____ of extra time to complete this session of the examination. You have exactly _____ minutes to finish this session of the examination after I tell you to begin.

BEGIN.

### APPENDIX A
### (Emergency Preparedness Plan)

. . . .

## APPENDIX E

## FEES

| Examination Fee: | An application fee of $490 payable by **bank cashier's check or money order**, payable to the <u>Director</u> ~~Secretary~~, Nebraska State Bar Commission, must accompany your application. The Nebraska State Bar Commission **does not** accept cash, personal checks, or firm checks. |
|---|---|
| . . . . | |
| Motion Fee: | The required $925 for a Class I-A, Class I-B, and Class I-C applicant must be paid in **bank cashier's check or money order only**, made payable to the <u>Director</u> ~~Secretary~~, Nebraska State Bar Commission. The Nebraska State Bar Commission **does not accept** cash, personal checks, or firm checks. |

Late Application Fee: $150 for applications received no more than 30 days past the filing deadline.

. . . .

## CHAPTER 3

## ATTORNEYS AND THE PRACTICE OF LAW

## ARTICLE 3

## DISCIPLINE PROCEDURES FOR LAWYERS

### § 3-301. Jurisdiction.

. . . .

(E) Every attorney admitted to practice in the State of Nebraska shall pay a disciplinary assessment for each calendar year from January 1 to December 31, payable in advance on or before January 1 of each year, in such amount as may be fixed by the Court. ~~The first disciplinary assessment shall~~

~~be due on or before January 1, 2001.~~ The disciplinary assessment shall be paid to the Treasurer of the Association and shall be used to defray the costs of disciplinary administration and enforcement as established by these rules. Different classifications of disciplinary assessments may be established for Active Jr., Active Sr., Active, Inactive, Military, and Emeritus members as those membership classes are defined in Neb. Ct. R. § 3-803. Members newly admitted to the practice of law in the State of Nebraska shall not pay a disciplinary assessment for the remainder of the calendar year in which they are admitted.

. . . .

### § 3-310. Procedure: Nebraska Supreme Court.

. . . .

(N) The Court may disbar, suspend, censure, or reprimand the Respondent, place him or her on probation, or take such other action as shall by the Court be deemed appropriate. All orders of public discipline shall be forwarded by the Clerk to the <u>Supreme Court's Director of Admissions</u> ~~membership secretary of the Nebraska State Bar Association~~.

. . . .

### § 3-311. Disability inactive status: Incompetency or incapacity.

. . . .

(D) If, upon due consideration of the matter, the Court concludes the member is incapacitated from continuing to practice law, it shall enter an order placing the member on disability inactive status on the grounds of such disability until further order of the Court, and any pending disciplinary proceeding against the member shall be held in abeyance. Members on disability inactive status shall not be required to pay ~~annual dues or disciplinary~~ <u>mandatory membership</u> assessments ~~to the Nebraska State Bar Association~~ <u>required by Neb. Ct. R. § 3-803(D)</u>.

. . . .

# CHAPTER 3
# ATTORNEYS AND THE PRACTICE OF LAW
## ARTICLE 8
### STATE BAR ASSOCIATION; CREATION;
### CONTROL; AND REGULATION

. . . .

## § 3-802. Purpose and authority.

(A) Purpose. The purposes of this Association are to assist in the collection and distribution of Nebraska Supreme Court mandatory membership assessments used to pay all costs associated with the Court's regulation of the practice of law; improve the administration of justice; to foster and maintain high standards of conduct, integrity, confidence, and public service on the part of those engaged in the practice of law; to safeguard and promote the proper professional interests of the members of the Bar; to provide improvements in the education and qualifications required for admission to the Bar, the study of the science of jurisprudence and law reform, and the continuing legal education of the members of the Bar; to improve the relations of the Bar with the public; to carry on a continuing program of legal research; and to encourage cordial relations among the members of the Bar. All of these purposes are to the end that the public responsibilities of the legal profession may be more effectively discharged.

(B) Government. Subject to the inherent authority of the Nebraska Supreme Court, Tthe supreme authority of this Association shall be vested in the membership thereof through the exercise of the power of Initiative and Referendum in such manner as may be prescribed in the bylaws. Subject thereto, and except as otherwise provided by the rules of the Supreme Court, the control over the business and affairs of this Association shall be vested in a House of Delegates, as provided in § 3-805. Subject to the overall control of the House of Delegates, the Executive Council shall function as the administrative and executive organ of the Association as provided in § 3-806. The officers of the Association, as hereinafter

enumerated, shall have the prerogatives, responsibilities, and qualifications and shall perform the duties of the respective offices, all as provided in § 3-804.

## § 3-803. Membership.

(A) Requirements and Records of Membership.

(1) All persons who, on the date that these rules go into effect, are admitted to the practice of law in this State, by order of the Nebraska Supreme Court, shall constitute the members of this Association, subject to due compliance with the requirements for membership hereinafter set forth, including payment of mandatory membership assessments as may be fixed by the Nebraska Supreme Court.

(2) The Director of Admissions, who shall be an employee of the Nebraska Supreme Court, shall maintain all records of membership of the Association and perform all other duties and responsibilities required by the Supreme Court and these rules.

(B) Classes. Members of this Association shall be divided into four classes, namely: Active members, Inactive members, Law Student members, and Emeritus members.

(1) All members who are licensed to engage in the active practice of law in the State of Nebraska, who do not qualify for and apply for Inactive membership status, and who are not Law Student members, shall be Active members.

(2) Any member who is not actively engaged in the practice of law in the State of Nebraska, or who is a nonresident of the State of Nebraska and not actively engaged in the practice of law in Nebraska, and who is not an Emeritus member, may, if he or she so elects, be placed in Inactive membership status.

A member desiring to be placed in Inactive membership status shall file written application therefor with the ~~Secretary~~ Director of Admissions and, if otherwise qualified, shall be placed in such inactive status classification. No Inactive members shall practice law in Nebraska, or vote or hold office in this Association. Any Inactive member may, on filing application

with the ~~Secretary~~ <u>Director of Admissions</u> and upon payment of the required dues, and compliance with such requirements as may be imposed by the Supreme Court to show fitness to engage in the active practice of law in this State, become an Active member.

(3) Any member who attained the age of 75 years of age during the dues year being billed or has been actively engaged in the practice of law in the State of Nebraska for 50 years or more during the dues year being billed may, if he or she so elects, be placed in an Emeritus membership status. A member desiring to be placed in an Emeritus membership status shall file written application therefor with the ~~Secretary~~ <u>Director of Admissions</u> and, if otherwise qualified, shall be placed in the Emeritus status classification. A member electing Emeritus classification shall not be required to pay membership dues to this Association. No Emeritus member shall practice law in Nebraska, or vote or hold office in this Association. Any Emeritus member may, on filing application with the ~~Secretary~~ <u>Director of Admissions</u> and upon payment of the required dues and compliance with the requirements as may be imposed by the Supreme Court to show fitness to engage in the active practice of law in this State, become an Active member.

. . . .

(6) In order to make information available to the public about the financial responsibility of each active member of this Association for professional liability claims, each such member shall, upon admission to the Bar, and ~~with~~ <u>as part of</u> each application for renewal thereof, submit the certification required by this rule. For purposes of this rule, professional liability insurance means:

. . . .

Each active member shall certify to ~~this Association~~ <u>the Nebraska Supreme Court, through its Director of Admissions,</u> on or before January 1 of each year: 1) whether or not such member is currently covered by professional liability insurance, other than an extended reporting endorsement;

2) whether or not such member is engaged in the private practice of law involving representation of clients drawn from the public; 3) whether or not such member is a partner, shareholder, or member in a domestic professional organization as defined by the rule governing Limited Liability Professional Organizations, and 4) whether or not the active member is exempt from the provisions of this rule because he or she is engaged in the practice of law as a full-time government attorney or in-house counsel and does not represent clients outside that capacity.

The foregoing shall be certified by each active member of this Association ~~in~~ on such form as may be prescribed by the Nebraska Supreme Court ~~this Association~~ which shall be included within the Association's annual mandatory assessment and voluntary dues statement. ~~and~~ Such certifications shall be made available to the public by ~~such~~ any means ~~as may be~~ designated by the ~~House of Delegates~~ Supreme Court. Failure to comply with this rule shall result in suspension from the active practice of law until such certification is received. An untruthful certification shall subject the member to appropriate disciplinary action. All members shall notify the ~~Secretary~~ Director of Admissions in writing within 30 days if 1) professional liability insurance providing coverage to the member has lapsed or is not in effect, or 2) the member acquires professional liability coverage as defined by this rule.

All certifications not received by April 1 of the current calendar year shall be considered delinquent. The ~~Secretary~~ Director of Admissions shall send written notice, by certified mail, to each member then delinquent in the reporting of professional liability insurance status, which notice shall be addressed to such member at his or her last reported address, and shall notify such member of such delinquency. All members who shall fail to provide the certification within 30 days thereafter shall be reported to the Supreme Court by the ~~Secretary~~ Director of Admissions, and the Supreme Court shall enter an order to show cause why such member shall not be

suspended from membership in this Association. The Supreme Court shall enter such an order as it may deem appropriate. If an order of suspension shall be entered, such party shall not practice law until restored to good standing.

. . . .

(C) Registration. All members not already registered with the ~~Secretary of this Association~~ Director of Admissions shall, within 60 days after being admitted to the practice of law by the Supreme Court of this State, register with the ~~Secretary of this Association~~ Director of Admissions by setting forth the member's full name, business address, and signature. All members shall promptly notify the ~~Secretary~~ Director of Admissions, in writing, of any change in such address.

(D) ~~Dues~~ Mandatory Membership Assessments.

(1) Payment of Assessments ~~Dues~~. Each member shall pay mandatory membership assessments ~~dues~~ to this Association for each calendar year from January 1 to December 31 following, payable in advance on or before January 1 of each year, in such amounts as may be fixed by the Supreme Court pursuant to Neb. Ct. R. §§ 3-100(B), 3-301(E). and 3-1010(B). All ~~dues~~ such assessments shall be paid to the Treasurer of this Association ~~and shall constitute the funds for furthering the purposes of this Association~~, remitted to the Nebraska Supreme Court and shall be used for the administration and enforcement of the regulation of the practice of law by the Court. Different classifications of ~~dues~~ assessments may be established for Active, Inactive, and Law Student members and for those members who have been admitted to the Bar of any State or other jurisdiction for a period of less than 5 years and for those members who are serving in the Armed Forces of the United States, while so serving. Members newly admitted to this Association shall receive a complimentary membership for the remainder of the current calendar year. The ~~A~~annual mandatory membership assessments ~~dues~~ beginning calendar year ~~2009~~ 2014 shall be as follows:

| Membership Class | § 3-100(B) (Adm.) | § 3-301(E) (Discipline) | § 3-1010(B) (UPL) | Total |
|---|---|---|---|---|
| Regular Active* | $25.00 | $60.00 | $13.00 | $98.00 |
| Junior Active** | $25.00 | $60.00 | $13.00 | $98.00 |
| Senior Active*** | $25.00 | $60.00 | $13.00 | $98.00 |
| Judicial Active | $25.00 | $60.00 | $13.00 | $98.00 |
| Military Active**** | 0 | 0 | 0 | 0 |
| Regular Inactive | $12.50 | $30.00 | $ 6.50 | $49.00 |
| Emeritus Inactive | 0 | 0 | 0 | 0 |

* (Members who have been admitted to the Bar of any State or other jurisdiction for more than 4 calendar years following the calendar year of admission.)

** (Members who have been admitted to the Bar of any State or other jurisdiction for 4 or fewer calendar years following the calendar year of admission.)

*** (Members 75 years of age or older during the assessments year being billed.)

**** (A member actively engaged in the Armed Forces of the United States at the beginning of any calendar year shall be exempt from payment of assessments for such year upon submitting to the Director of Admissions, prior to the date of delinquency provided for in this Article, satisfactory proof that he or she is so engaged; upon receipt of such proof, the Director of Admissions shall issue a membership card to the member under the classification held by the member prior to his or her induction in the service and shall cause the records of this Association to show that such card was issued without payment of dues.)

| | |
|---|---|
| ~~Active~~ ~~(Members who have been admitted to the Bar of any State or other jurisdiction for more than 4 calendar years following the calendar year of admission.)~~ | ~~$275~~ |
| ~~Junior Active~~ ~~(Members who have been admitted to the bar of any State or other jurisdiction for 4 or fewer calendar years following the calendar year of admission.)~~ | ~~$160~~ |

| | |
|---|---|
| ~~Senior Active~~ ~~(Members 75 years of age or older during the dues year being billed.)~~ | ~~$ 70~~ |
| ~~Inactive~~ | ~~$ 65~~ |
| ~~Military~~ ~~(A member actively engaged in the Armed Forces of the United States at the beginning of any calendar year shall be exempt from payment of dues for such year upon submitting to the Secretary, prior to the date of delinquency provided for in this Article, satisfactory proof that he or she is so engaged; upon receipt of such proof, the Secretary shall issue a membership card to the member under the classification held by the member prior to his or her induction in the service and shall cause the records of this Association to show that such card was issued without payment of dues.)~~ | ~~$ 0~~ |
| ~~Emeritus~~ | ~~$ 0~~ |

~~Effective January 1, 1999, and each year thereafter, a~~ (2) A late fee of $25 shall be assessed each Active or Inactive member whose ~~dues~~ mandatory assessments are received after January 1, a late fee of $50 shall be assessed on ~~dues~~ mandatory assessments received on or after February 1, and a late fee of $75 shall be assessed on ~~dues~~ mandatory assessments received on or after March 1.

(3) Funds collected by mandatory assessments pursuant to Neb. Ct. R. §§ 3-100(B) and 3-1010(B) shall be used by the Nebraska Supreme Court's Director of Admissions and Counsel on Unauthorized Practice of Law for regulatory management and oversight as required by the Court under its constitutional and inherent authority.

~~(2) Lobbying and Related Activities.~~

~~(a) This Association may use dues to analyze and disseminate to its members information on proposed or pending legislative proposals.~~

(b) All lobbying activities shall be subject to the following restrictions: The annual dues notice shall offer the members of the Bar an opportunity to direct that the stated amount of their dues intended for lobbying activities be placed instead in a restricted account. Funds from this account shall be budgeted by the Executive Council for activities which will promote the administration of justice or improvements of the legal system. The established budget for lobbying activities shall be reduced by the amount that is directed to the restricted account.

(E) Delinquency and Reinstatement. All dues and mandatory membership assessments not paid by April 1 of the current calendar year shall be considered delinquent; and the Secretary Director of Admissions shall send written notice, by certified mail, to each member then delinquent in the payment of his or her dues and assessments, which notice shall be addressed to such member at his or her last reported address, and shall notify such member of such delinquency. All members who shall fail to pay delinquent dues and assessments within 30 days thereafter shall be reported to the Supreme Court by the Secretary Director of Admissions, and the Supreme Court shall enter an order to show cause why such member shall not be suspended from membership in this Association. The Supreme Court shall, after hearing thereon, enter such an order as it may deem appropriate. If an order of suspension shall be entered, such party shall not practice law until restored to good standing. Whenever a member suspended for nonpayment of dues and/or mandatory membership assessments shall make payment of all arrears, and shall satisfy the Supreme Court of his or her qualification to then return to the active practice of law, such member shall be entitled to reinstatement upon request. The Secretary Director of Admissions shall keep a complete record of all suspensions and reinstatements. No person, while his or her membership is suspended, shall be entitled to exercise or receive any of the privileges of membership in this Association.

(F) Suspension or Disbarment. Any member who shall be suspended or disbarred from the practice of law by the Supreme

Court shall, during the period of such suspension or disbarment, be likewise suspended or barred from membership in this Association. On reinstatement to practice by the Supreme Court, such party shall, on written request and upon payment of the requisite fees and/or mandatory assessments, be restored to membership in this Association.

(G) Fees. Nothing herein contained shall be construed to limit the power of this Association, or of any of its sections or committees, to assess voluntary registration fees or attendance fees for meetings, institutes, or continuing legal education sessions as may be approved or determined from time to time by the House of Delegates or the Executive Council.

(H) Resignation. Any member may resign either active or inactive membership in this Association by tendering his or her written resignation to the Clerk of the Supreme Court of Nebraska on a form to be provided. This form shall include an affidavit to be completed by the member seeking to resign, stating that the member has not been suspended or disbarred in any other state or by any court; that the member has not voluntarily surrendered his or her license to practice law in any other state or to any court in connection with any investigation or disciplinary proceeding against the member; that to the member's knowledge he or she is not then under investigation, nor has a complaint or charges pending against him or her with reference to any alleged violation of professional responsibilities as a lawyer; and that the member agrees to be subject to the jurisdiction of the Supreme Court for a period of 3 years from the date his or her resignation is accepted for the purpose of disciplinary proceedings for any alleged violation of his or her professional responsibilities as a lawyer. During this 3-year period, the acceptance of his or her resignation may be set aside by the Supreme Court upon application filed in the Supreme Court by the Counsel for Discipline. If the affidavit is completed, the Supreme Court may accept the resignation, provided the resigning member's ~~dues~~ mandatory membership assessments are not delinquent, or may accept it upon payment of any such delinquent ~~dues~~ assessments, unless the member

seeking to resign has been suspended for the nonpayment of ~~dues~~ assessments as provided for in § 3-803(E), in which event the submitted resignation shall not be acted upon until the member seeking resignation has been reinstated as provided for in said section. In the event the affidavit is not fully completed, or any exception is taken to it, the tendered resignation shall be rejected. The Clerk shall keep a complete record of all requests for resignation and all resignations and shall report to the ~~Secretary~~ Director of Admissions the names and addresses of members whose resignations have been accepted by the Supreme Court.

(I) Reinstatement Following Resignation. Whenever a former member of this Association who resigned is readmitted to the practice of law in Nebraska by the Supreme Court, the member shall pay ~~dues~~ mandatory membership assessments for the year in which he or she is readmitted and be reinstated as a member of this Association.

(J) Voluntary Dues for Lobbying and Related Activities.

This Association may establish, collect, and use voluntary membership dues to analyze and disseminate to its members information on proposed or pending legislative proposals and any other nonregulatory activity intended to improve the quality of legal services to the public and promote the purposes of the Association as set forth in § 3-802.

§ 3-804. Officers.

. . . .

(G) Duties and Powers.

. . . .

(5) The Secretary shall be the custodian of the records and archives of this Association; ~~shall maintain the membership and all other records of this Association;~~ shall report the minutes of all meetings of this Association, the Executive Council, and the House of Delegates; and shall perform such other duties and responsibilities as may be provided by the bylaws and these rules.

(6) The Treasurer shall be the custodian of and shall supervise the collection and disbursement of all funds and properties of this Association, shall disburse the funds of this Association as provided in §§ 3-803(D) and 3-809, and shall have such other duties and responsibilities as may be provided by the bylaws and these rules.

(7) The Executive Director shall have such responsibilities and perform such duties as shall be delegated to him or her by the Nebraska Supreme Court, Executive Council, and the House of Delegates and shall perform such other duties and responsibilities as may be provided by the bylaws.

. . . .

## § 3-805. House of delegates.

(A) Duties and Powers. Except as otherwise provided by the Nebraska Supreme Court, Tthe House of Delegates shall be the governing body of this Association; shall exercise overall jurisdiction over the affairs of this Association; shall determine and implement the policies and objectives of this Association; shall, consistent with these rules and the purposes of this Association, prepare, adopt, and amend bylaws for the government and operation of this Association, including the provisions for an annual meeting of this Association; and shall perform such other functions as are provided by these rules and the bylaws.

. . . .

(H) Personnel and Publications. Except as otherwise provided by the Nebraska Supreme Court and these rules, Tthe House of Delegates shall have the power and the duty to fully administer this Article, including the power to employ necessary personnel and to establish the policies of this Association relating to official publications thereof.

. . . .

## § 3-808. Meetings.

(A) Annual Meeting. This Association shall may have one regular meeting annually at a time and place to be fixed by the

Executive Council. Each member of this Association shall be notified thereof by the Secretary by mail.

. . . .

(D) Emergency Meetings. In case of extreme emergency, the Executive Council, with the approval of the Supreme Court, may dispense with the calling of the Annual Meeting, but in such event shall call, in lieu thereof, a special session of the House of Delegates. In the case of extreme emergency, the Executive Council may call a special meeting, in such manner as may be determined by such Council, of all persons licensed to practice law in Nebraska.

### § 3-809. Budget and audit.

(A) Budget Preparation and Approval. The Budget and Planning Committee of this Association, consisting of not more than 13 members, shall study the income and expenses of this Association, based on its collection and expenditure of its annual voluntary dues, and shall prepare and submit to the Executive Council a proposed budget for each fiscal year of this Association. The Executive Council shall, upon receipt of such proposed budget, pass upon the same, and shall thereupon prepare and submit an annual budget of this Association's receipts and expenditures to the House of Delegates for its consideration and approval. Such proposed budget shall not be effective until 30 days after it shall be approved by a majority vote of the House of Delegates at a meeting for which at least 30 days' notice, including a copy of the proposed budget, has been given. The House of Delegates by majority vote thereof may amend or modify the proposed budget prior to its final adoption.

. . . .

(D) Circulation of Budget and Audit. The Executive Council, prior to the Annual Meeting of this Association, shall file with the Clerk of the Supreme Court and shall cause to be distributed to the voluntary members of this Association a copy of the current annual budget, the proposed budget for the succeeding year, and an annual statement showing a balance sheet and operating statement for the last preceding fiscal year.

. . . .

## § 3-811. Bylaws.

Suitable bylaws, not inconsistent with these rules, shall be adopted by the House of Delegates and shall be amended as necessary to reflect all Supreme Court amendments to these rules.

. . . .

## § 3-813. Enabling rules.

. . . .

(B) Effective Date. These rules shall become effective on January 1, ~~1971~~ 2014.

. . . .

## § 3-814. Filing bylaws and rules.

The Nebraska State Bar Association shall at all times keep on file with the Clerk of the Nebraska Supreme Court and Court of Appeals a current copy of its bylaws and all rules under which its House of Delegates, Executive Council, and various committees and sections operate.

## CHAPTER 3

## ATTORNEYS AND THE PRACTICE OF LAW

## ARTICLE 9

## TRUST FUND REQUIREMENTS FOR LAWYERS

. . . .

## § 3-905. Trust account affidavit rules.

. . . .

(E) Until otherwise directed by the Supreme Court, the affidavits and any other information required by § 3-905 shall be collected and maintained by the Bar Association on behalf of the Nebraska Supreme Court.

. . . .

## CHAPTER 3

## ATTORNEYS AND THE PRACTICE OF LAW

## ARTICLE 10

## UNAUTHORIZED PRACTICE OF LAW

. . . .

### § 3-1010. Jurisdiction.

(A) Except as otherwise provided by § 3-1012(B), the Supreme Court, in the exercise of its inherent jurisdiction to define the practice of law and to prohibit the unauthorized practice of law within the State of Nebraska, adopts the following procedures, which shall govern proceedings under these rules concerning the unauthorized practice of law (UPL).

(B) Every attorney admitted to practice in the State of Nebraska shall pay a UPL assessment for each calendar year from January 1 to December 31, payable in advance on or before January 1 of each year, in such amount as may be fixed by the Court. The first UPL assessment shall be due on or before January 1, 2014. In accordance with Neb. Ct. R. § 3-803(D), such assessment shall be paid to the Treasurer of the Nebraska State Bar Association and shall be used to defray the costs of the administration and enforcement of the unauthorized practice of law as established by these rules. Different classifications of UPL assessments may be established for Active Jr., Active Sr., Active, Inactive, Military, and Emeritus members as those membership classes are defined in Neb. Ct. R. § 3-803. Members newly admitted to the practice of law in the State of Nebraska shall not pay a UPL assessment for the remainder of the calendar year in which they are admitted.

(C) Members who fail to pay the UPL assessment shall be subject to suspension from the practice of law as provided in Neb. Ct. R. § 3-803(E).

## § 3-1011. Commission; creation.

. . . .

(C) The Chief Justice shall appoint one member to chair the Commission and one member as the secretary of the Commission.

. . . .

## § 3-1012. Commission; jurisdiction and duties.

. . . .

(E) The Supreme Court hereby appoints the Executive Director of the Nebraska State Bar Association as Secretary of the Commission.

## § 3-1013. Counsel; appointment and duties.

(A) There shall be a Counsel on Unauthorized Practice of Law (CUPL), who shall be a member of the Nebraska State Bar Association.

(B) The CUPL shall be an employee of the Nebraska Supreme Court State Bar Association, which shall fund the operations of the office of the CUPL from the mandatory Supreme Court assessment established pursuant to § 3-1010(B).

(C) The CUPL shall perform for the Nebraska Supreme Court and the Commission all duties as required by these rules.

(D) The CUPL shall investigate all matters within the jurisdiction of the Commission in accordance with procedures adopted by the Commission and approved by the Supreme Court and shall perform the following duties:

(1) Maintain records of all matters coming within the jurisdiction of the Commission.

(2) Secure facilities for the administration of proceedings under these rules and receive and file all requests for investigation and complaints concerning matters within the jurisdiction of the Commission.

(3) Employ such staff, including investigative and clerical personnel, subject to the approval of the Supreme Court

~~Commission~~, as may be necessary to carry out the duties of the office.

(4) Perform such other duties as ~~the Commission or~~ the Supreme Court <u>or the Commission</u> may require.

. . . .

## NEBRASKA COMMISSION ON UNAUTHORIZED PRACTICE OF LAW ADMINISTRATIVE RULES, REGULATIONS, AND PROCEDURES

. . . .

**III. Officers<u>.</u>**

**a. Chairperson.** The Chief Justice of the Supreme Court shall annually designate a chairperson from among the Commission members. Neb. Ct. R. § 3-1011(C).

**b. Vice Chairperson and Other Officers.** The Commission shall elect a vice chairperson each year, and such other officers as it may deem necessary to carry out the purposes of the Commission. Neb. Ct. R. § 3-1011(E).

**c. Secretary.** The Secretary of the Commission ~~shall be the custodian of all records of the Commission and~~ shall keep minutes of all meetings held by the Commission, or its designated committees or panels. All such records and minutes shall be kept at the offices of the <u>Counsel on the Unauthorized Practice of Law, who shall be the custodian of such records</u> ~~NSBA~~. Neb. Ct. R. § 3-10~~12(E)~~<u>13</u>.

. . . .

**VI. Administration of Commission.**

**a. Counsel on Unauthorized Practice of Law.** Neb. Ct. R. § 3-1013.

**i.** The Counsel on Unauthorized Practice of Law (CUPL) ~~will~~ <u>shall</u> be hired by the ~~Executive Director of the NSBA~~ <u>Nebraska Supreme Court</u> and shall be an employee of the ~~NSBA~~ <u>Court</u>. The ~~NSBA~~ <u>Court</u> shall provide to the CUPL any

additional staff support as ~~designated by the Executive Director~~ approved by the Court. Neb. Ct. R. § 3-1013(~~B~~D)(3).

**ii.** The CUPL shall not be entitled to a vote on Commission matters.

**iii.** The CUPL shall be responsible for the duties prescribed in the Court Rules, Neb. Ct. R. § 3-1013, and other duties as assigned by the Supreme Court~~,~~ or the Commission~~, or Executive Director of the NSBA~~.

**iv.** The CUPL shall send out notices of meetings of the Commission and prepare the preliminary agenda for each meeting.

**b. Budget.** The ~~Executive Director of the NSBA and the~~ CUPL, with the input of the Commission, shall prepare an annual budget for the performance of the Commission's activities. ~~The Commission's budget will be part of the full NSBA budget and will be subject to the same process for approval.~~ ~~NSBA~~ The Nebraska Supreme Court shall pay, from the UPL assessment mandated by Neb. Ct. R. §§ 3-1010(B) and 3-803(D), all expenses reasonably and necessarily incurred by the Commission ~~pursuant to the budget and the expense policy of the NSBA~~. Members of the Commission shall be entitled to reimbursement for reasonable expenses incurred in the performance of their official duties.

**c. Letterhead.** Use of Commission letterhead shall be limited to official business of the Commission and specifically shall not be used in connection with any political campaign or to support or oppose any public issue, or for personal or charitable purposes.

. . . .

**VIII. Advisory Opinions.**

. . . .

**g. Publication of Advisory Opinions.** The Commission may arrange for the publication of advisory opinions in the Nebraska Lawyer magazine, on the NSBA Web site, on the Nebraska Supreme Court Web site, or elsewhere as it deems

appropriate. Opinions so published shall not, insofar as practicable, identify the party or parties making the inquiry, the complainant, or the respondent without the written permission of the party or parties making the request.

. . . .

## X. Investigation.

The complainant and the respondent may be interviewed, and such other and further review or investigation may be conducted as is deemed appropriate. The complainant may submit additional information. During the course of the investigation, the CUPL and/or the Commission may use its power, as provided in the Court Rules, to subpoena witnesses, compel production of documentary evidence, swear witnesses, take testimony, and cause transcripts to be made. Neb. Ct. R. § 3-1014(B) through (D).

**a. Methods of Investigation.** The CUPL may use such methods and means of conducting the investigation as the Commission shall deem appropriate, including written correspondence, electronic correspondence, telephone calls, teleconferences, personal meetings, consultation with law enforcement and government officials, hiring outside investigators, online research, or other legal organizations, and any other NSBA resources. All communications shall strictly comply with the Court Rules regarding confidentiality. Neb. Ct. R. § 3-1020(C) through (G); however, CUPL may disclose basic information that is essential to the conduct of the investigation.

. . . .